IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DENISE CASSESE f/k/a DENISE CALIGUIRI, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> WASHINGTON MUTUAL, INC.<br> WASHINGTON MUTUAL BANK, FA,<br> WASHINGTON MUTUAL BANK, FSB,<br> WASHINGTON MUTUAL BANK,<br> WASHINGTON MUTUAL HOME LOANS, INC.,<br><br> Defendants. | Civil Action No. <br><br> **05    2724** <br><br> **JURY TRIAL DEMANDED** <br><br> FILED<br> IN CLERK'S OFFICE<br> U.S. DISTRICT COURT, E.D.N.Y.<br> ★ JUN – 6 2005<br> BROOKLYN OFFICE <br><br> PLATT, J. <br><br> LINDSAY, M.J. |

## CLASS ACTION COMPLAINT

Plaintiff Denise Cassese ("Plaintiff"), individually and on behalf of all others similarly situated, for her complaint against Washington Mutual, Inc. ("WMI"), Washington Mutual Bank FA ("WMBFA"), Washington Mutual Bank, fsb ("WMBfsb"), Washington Mutual Bank ("WMB") and Washington Mutual Home Loans, Inc. ("WMHLI") (collectively "Defendants"), alleges upon information and belief, except as to the allegations which pertain to Plaintiff and her counsel, which claims are based on personal knowledge, as follows:

## INTRODUCTION

1.    Defendants engage in the practice of mortgage banking and home loan lending in New York and other states. This practice involves initiating or originating loans, keeping a small number of those loans for their own portfolio and "reselling" the large majority to the Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"), the Government National

Mortgage Association ("GNMA" or "Ginnie Mae) and Federal National Mortgage Association ("FNMA" or "Fannie Mae").

2.     When applying for their mortgages from Defendants, Plaintiff and the Class received uniform mortgage contracts and notes prepared by Defendants, specifying the fees, if any, Defendants could charge for the servicing, satisfaction, discharge and recording of loans, among other fees and costs.  These uniform mortgage contracts and notes were prepared by Defendants and contained the parties' rights and obligations, as constrained by applicable law.

3.     In the Fixed/Adjustable Rate Note prepared by WMB, under the section entitled "BORROWER'S RIGHT TO PREPAY," Defendants state the Plaintiff "may make a full prepayment or partial prepayments without paying any prepayment charge."

4.     Defendants routinely charge consumers prepayment fees, charges and penalties not permitted by their mortgage and note contracts, not permitted by federal and state laws, not permitted by regulations of the Office of Thrift Supervision ("OTS") and not permitted for mortgage loans sold to FNMA, GNMA and FHLMC.

5.     The fees improperly charged and collected are in practice and practical effect undisclosed finance charges, prepayment penalties, refinancing penalties, unearned settlement fees and payoff statement fees levied by Defendants on consumers that payoff mortgages and home loans prior to maturity.

6.     At the time of satisfaction of Class members' mortgage and home loans, Defendants, acting as the "servicer" of mortgage and home loans, present Plaintiff and other mortgagors/obligors with a statement containing the amount necessary to payoff the mortgage and/or home loan debt and for various fees, charges and penalties imposed and collected by

2

Defendants. Some of those fees relate to discharge, satisfaction or prepayment of the mortgages and/or home loans, and are thus improper under the mortgage, note and other agreements and applicable laws. Other charges concern recording fees, and were improperly charged to the extent Defendants did not timely record the mortgage satisfactions in accordance with applicable laws, including state laws.

7. Defendants do not advise consumers that they resell many of the mortgage and home loans they originate to FNMA, GNMA and FHLMC. Nor do Defendants inform Plaintiff and Class when Defendants charge and collect improper and unlawful fees. To the contrary, Defendants routinely make affirmative misrepresentations about such fees. As a result of Defendants' misrepresentations and omissions, Plaintiff (until recently) and many if not most Class members remain reasonably unaware that the fees, charges and penalties Defendants impose and collect are improper under the mortgage and note contracts drafted by Defendants, and under applicable laws, including state laws and federal regulations.

8. Defendants acted and continue to act deceptively, unfairly and fraudulently to further their scheme to collect unearned and improper fees, charges and penalties from Plaintiff and the Class of consumers. Defendants also misrepresented and/or omitted material facts in standardized mortgage and note documents given to Plaintiff and the Class. Plaintiff and the Class were injured as a result of Defendants' acts, practices and conduct in an amount believed to exceed $5,000,000.

9. Plaintiff and the Class seek damages and equitable relief for Defendants' continuing and past violations of the Truth In Lending Act, 15 U.S.C. §1601 *et seq.* ("TILA"), the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §2601 *et. seq.* ("RESPA"), New

York Real Property Actions & Proceedings Law §1921, New York Real Property Actions & Proceedings Law §274-a and the similar consumer protection laws of other states, New York General Business Law ("GBL") §349 and the similar consumer protection laws of other states, breach of contract, common law fraud and unjust enrichment.

## JURISDICTION AND VENUE

10.     Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. §1331, 28 U.S.C. §1332(d), 15 U.S.C. §1640(e) and 12 U.S.C. §§ 2607(d), 2610, and 2614.  In addition, this Court has supplemental jurisdiction over Plaintiff's and Class members' state and common law claims pursuant to 28 U.S.C. §1367(a).

11.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Defendants maintain offices in this District, at all times conducted substantial business in this District, and because a substantial part of the events and omissions giving rise to this action occurred in this District.

## TRADE AND COMMERCE

12.     In connection with Defendants' origination, sale, solicitation, and resale of mortgage and home loans, monies, contracts, bills and other forms of business communications and transactions were transmitted in a continuous and uninterrupted flow across state lines.

13.     Various means and devices were used to effectuate the violations of law and conspiracy alleged herein, including the United States mail, interstate travel, interstate telephone commerce and other forms of interstate electronic communications.  The activities of Defendants alleged herein were within the flow of, and have substantially affected, interstate commerce.

4

## PARTIES

### Plaintiff

14.     Plaintiff is a resident of Nassau County, New York and was a mortgagor of WMBFA commencing in August 1998.  In a payoff statement dated June 7, 2002, Plaintiff received a demand from "Washington Mutual" listing the amounts "required to pay this loan in full" and "the additional loan servicing fees that are due and owing to Washington Mutual relating to this transaction."  Included among the "additional loan servicing fees" was a payoff statement fee of $10 described as a fee for "Unpaid Late Charges and/or other fees" and a "Recording Fee" of $26.50.  Plaintiff paid these fees, unaware that such payments were not due to Defendants, and has been injured as a result of Defendants' deceptive, false and misleading acts and practices and breach of the mortgage and note agreements.

### Defendants

15.     WMI is a Washington corporation that maintains its principle place of business and headquarters at 1201 Third Avenue, Seattle, Washington.  WMI is the largest savings and loan holding company in the United States, and through its subsidiaries was the largest mortgage servicer in the nation.  WMI is publicly traded on the New York Stock Exchange under the symbol "WM."  WMI is also the parent company of each of the other Defendants, and actively supervises and controls each of their activities and operations, as admitted in its Form 10-K for the year ended December 31, 2004:  "All of our banking subsidiaries are under the common control of Washington Mutual, Inc."  WMI reports the operating results of the other Defendants in WMI's publicly-filed financial statements.  WMI individually and through its subsidiaries engages in substantial business nationwide and within this District.  In a January 27, 2005 press

5

release, WMI boasted that: "Washington Mutual currently operates more than 2,400 retail banking, mortgage lending, commercial banking and financial services offices throughout the nation."

16.     WMBFA is a Washington corporation that maintains its principle place of business and headquarters in Stockton, California.  WMBFA is a federally-chartered savings association, a member of the Federal Home Loan Bank System and of the San Francisco Federal Home Loan Bank.  WMBFA's business comprises attracting retail deposits from the general public and investing those deposits in residential mortgage and home loans originated and sold by WMBFA and its affiliate companies.  WMBFA also acts as the servicer of mortgage and residential home loans, both before and after it resells those loans in the secondary market.  WMBFA is a wholly-owned subsidiary of WMI, is controlled by WMI and reports its financial results in WMI's publicly-filed financial statements.  WMBFA engages in substantial business nationwide and within this District.  In January 2005, WMBFA merged with WMB and was renamed "Washington Mutual Bank."

17.     WMBfsb maintains its principle place of business and headquarters at 1201 Third Avenue, Seattle, Washington.  WMBfsb is a federally-chartered savings association, a member of the Federal Home Loan Bank System and of the Seattle Federal Home Loan Bank.  WMBfsb's business comprises attracting retail deposits from the general public and investing those deposits in residential mortgage and home loans originated and sold by WMBfsb and its affiliate companies.  WMBfsb also acts as the servicer of mortgage and residential home loans, both before and after it resells those loans in the secondary market.  WMBfsb has been a wholly-owned subsidiary of WMBFA since February 2004, and is an indirect wholly-owned subsidiary

of WMI, who controls WMBfsb and reports its financial results in WMI's publicly-filed financial statements.   WMBfsb engages in substantial business nationwide and within this District.

18.     WMB is or was a Washington state corporation and Washington state-chartered savings bank that maintains its principle place of business and headquarters at 1201 Third Avenue, Seattle, Washington.   WMB's business comprises attracting retail deposits from the general public and investing those deposits in residential mortgage and home loans originated and sold by WMB and its affiliate companies.   WMB also acts as the servicer of mortgage and residential home loans, both before and after it resells those loans in the secondary market. WMB is a wholly-owned subsidiary of WMI, who controls WMB and reports its financial results in WMI's publicly-filed financial statements.   WMB engages in substantial business nationwide and within this District.   It maintains "home loan centers" throughout this District, including offices in Bayside, Brooklyn, Garden City, Hauppauge and Melville.   In January 2005, WMB merged with WMBFA, retaining the name "Washington Mutual Bank."

19.     WMHLI is an Ohio corporation registered with the New York Department of State as an active foreign business corporation that maintains its principle place of business and headquarters at 1201 Third Avenue, Seattle, Washington.   WMHLI was formed as a result of WMBFA's acquisition of the mortgage origination and securitization operations of PNC Financial Services Group on January 31, 2001.   WMBLI thereafter acquired Fleet Mortgage Corporation on June 1, 2001.   WMHLI merged into WHBFA on March 1, 2002.   Prior to that time, it operated as a wholly-owned subsidiary of WMI, who controlled WMBLI and reported WMBLI's financial results in WMI's publicly-filed financial statements.

7

# FACTUAL ALLEGATIONS

### The Creation Of Washington Mutual As
### Nation's Largest Mortgage Lender and Servicer

20. According to WMI, as of "December 31, 2004 we were the largest thrift holding company in the United States and the seventh largest among all U.S.-based bank and thrift holding companies." WMI explains that its "earnings are primarily driven by real estate secured lending and deposit taking activities which generate net interest income and by activities that generate noninterest income, including the sale and servicing of loans and providing fee-based services to our customers. Real estate secured loans and mortgage-backed securities generate more than 90% of interest income and this concentration is likely to continue as a result of our decision to exit certain non-core businesses, such as lending to mid- and large-sized companies."

21. WMI has become the nation's largest mortgage servicer and mortgage lender through a combination of aggressive acquisitions and retail growth. Its acquisitions include the following banks, savings and loans and other institutions:

- HomeSide Lending, Inc., Florida, 2002
- Dime Bancorp, Inc., New York, 2002
- Fleet Mortgage Corp., South Carolina, 2001
- Bank United Corp., Texas, 2001
- PNC Mortgage, Illinois, 2001
- Alta Residential Mortgage Trust, California, 2000
- Long Beach Financial Corp., California, 1999
- Industrial Bank, California, 1998
- H.F. Ahmanson (Home Savings of America), California, 1998
- Great Western Financial Corp., 1997
- United Western Financial Group, Inc., Utah, 1997
- Keystone Holdings, Inc. (American Savings Bank), California, 1996
- Utah Federal Savings Bank, 1996
- Western Bank, Oregon, 1996
- Enterprise Bank, Washington, 1995
- Olympus Bank fsb, Utah, 1995

- Summit Savings Bank, Washington, 1994
- Far West Federal Savings Bank, Oregon, 1994
- Pacific First Bank, Ontario, 1993
- Pioneer Savings Bank, Washington, 1993
- Great Northwest Bank, Washington, 1992
- World Savings & Loan Association, California, 1992
- Sound Savings & Loan Association, Washington, 1991
- CrossLand Savings fsb, Utah, 1991
- Vancouver Federal Savings Bank, Washington, 1991
- Williamsburg Federal Savings Association, Utah, 1990
- Frontier Federal Savings Association, Washington, 1990
- Old Stone Bank of Washington, FSB, Rhode Island, 1990
- Columbia Federal Savings Bank, Washington, 1988
- Shoreline Savings Bank, Washington, 1988
- Lincoln Mutual Savings Bank, Washington, 1985
- United Savings Bank, Washington, 1983

22.    Commenting on the growth of its mortgage and home loan origination and servicing business, WMI stated as follows in its 2004 Form 10-K:

Following the acquisition of the three largest California-based thrift institutions in the latter part of the 1990s, we continued to expand nationally by acquiring companies with strong retail banking franchises in Texas and the greater New York metropolitan area. During this period, we developed and launched our award-winning and innovative retail banking stores that serve customers in an open, free-flowing retail environment. With the goal of combining our strengths as a deposit taker and portfolio lender with those of a mortgage banker, we also expanded our presence in the home loan origination and servicing businesses through acquisition. These mortgage banking acquisitions also served to further broaden our national footprint.

23.    While WMI has grown substantially from acquisitions, consumers have suffered from a host of deceptive practices.  According to a December 31, 2001 article appearing in *Business Week*, "[b]uying businesses to acquire customers has been a core strategy for WaMu." However, the article continues, "[a]s the budding financial services giant has done a flurry of deals to acquire rivals throughout the country, including some with troubled business practices, it appears that problems at those units haven't always been resolved."

9

24.    WMI organizes its operations into three operating segments, the Mortgage Banking Group, the Retail Banking and Financial Services Group and the Commercial Group.

25.    The Mortgage Banking Group's principle activities comprise i) Originating and servicing home loans; ii) Buying and selling home loans in the secondary market; and iii) Selling insurance-related products and participating in reinsurance activities with other insurance companies.

26.    The Retail Banking and Financial Services Group is responsible for "managing and servicing home equity loans and lines of credit" among other activities.

27.    WMI described its mortgage serving business as follows:

Mortgage servicing involves the administration and collection of home loan payments. In servicing home loans we collect and remit loan payments, respond to borrower inquiries, apply the collected principal and interest to the individual loans, collect, hold and disburse escrow funds for payment of property taxes and insurance premiums, counsel delinquent customers, supervise foreclosures and property dispositions and generally administer the loans. In return for performing these functions, we receive servicing fees and other remuneration. The Mortgage Banking Group performs home loan servicing activities for substantially all of the Company's managed portfolio – whether the home loans are held in portfolio or have been sold to secondary market participants.

28.    As of the December 31, 2003, WMI and its subsidiaries owned mortgage loans valued at $113.02 billion, increasing to $129.13 billion as of December 31, 2004.  It also owns approximately $44 billion of home equity loans.  WMI and its subsidiaries service an even greater amount of mortgage and residential home loans, including those sold to FNMA, GNMA and/or FHLMC.

29.    WMI's Mortgage Banking Group generates substantial revenues and profits, including the unlawful fees, penalties and charges collected from consumers having mortgage

and home loans serviced by WMI's subsidiaries.    In fact, WMI ranked as the largest originator and servicer of mortgages in the entire United States until some time in 2004.

30.    WMI and its subsidiaries reported annual net income of $2.88 billion in 2004 and $3.88 billion in 2003.  For those years, respectively, WMI's profits from its Mortgage Banking segment were $570 million and $1.30 billion.  As stated in WMI's 2004 Form 10-K:  "Home loan mortgage banking income was $1.39 billion in 2004, a decrease of $587 million from $1.97 billion in 2003. ... This resulted in a decline in gain from mortgage loans from $1.25 billion in 2003 to $649 million in 2004."

31.    In its 2004 Form 10-K, WMI reported loan servicing income in excess of $1.9 billion in 2004, $2.2 billion in 2003 and $2.2 billion in 2002.

32.    In an effort to manage risk on its loan portfolio and to expand its ability to make more loans, Defendants generally resell the mortgage and home loans they originate and thereafter assume the role of "servicing" the mortgages, namely collecting the monthly mortgage payments and handling customer relations for which they receive fees from the owner of the loans and the mortgagors, and other fees, penalties and charges imposed on consumers.

33.    In its Form 10-K for the period ended December 31, 2002, WMI states: "We generally sell newly originated fixed-rate home loans and hybrid home loans to the Federal National Mortgage Association ('Fannie Mae'), and government sponsored enterprise."  In its 2004 Form 10-K, WMI confirmed that its: "Fixed-rate home loans, which subject us to more interest rate risk than other types of home loans, are generally sold as part of our overall asset/liability risk management process."

11

34.     In its 2004 Form 10-K, WMI states that its: "Home loans are either sold to the Retail Banking and Financial Services Group or are sold to secondary market participants, including the housing government-sponsored enterprises – such as the Federal National Mortgage Association ('Fannie Mae'), the Federal Home Loan Mortgage Corporation ('Freddie Mac') and the regional branches of the Federal Home Loan Banks."

35.     As of December 31, 2004, WMI and its subsidiaries reported assets of $307.92 billion.

*Defendants Charge Improper, Undisclosed and Unearned Fees, Charges and Penalties*

36.     On or around August 28, 1998, Plaintiff entered into an Adjustable Interest Rate Mortgage and Fixed/Adjustable Rate Note with WMBFA to borrow money to purchase a residence in Nassau County, New York.

37.     The Adjustable Interest Rate Mortgage was a standardized form mortgage contract prepared by WMB and modified only on the first and last pages as to terms of dollar amount of the Note and specifics about the borrower and the property.  The standard form contract was titled "New York—Single Family—FNMA/FHLMC UNIFORM INSTRUMENT" and "Form 3033 10/91."  This Adjustable Interest Rate Mortgage contained a choice of law provision stating that federal and New York law would apply, and contains references to specific New York statutes.  This uniform mortgage, or others created by the FHLMC, FNMA and/or GNMA, are routinely used by Defendants or originate residential mortgage loans.

38.     The Fixed/Adjustable Rate Note was a standardized agreement prepared by WMB and modified only on the first page as to the dollar amount of the Note and specifics about the borrower and the property.   Paragraph 11 of the Fixed/Adjustable Rate Note, entitled

"UNIFORM SECURED NOTE," states:  "This Note is a uniform instrument with limited variations in some jurisdictions."

39.     Paragraph 5 of the Fixed/Adjustable Rate Note, "BORROWER'S RIGHT TO PREPAY," states that Plaintiff "may make a full prepayment or partial prepayments without paying any prepayment charge."

40.     Defendants admit in their filings with the Securities and Exchange Commission ("SEC") and other public statements that they generally sell the mortgages they originate into the secondary market dominated by FNMA, GNMA and FHLMC.  Following those sales, Defendants often become the servicer of those mortgages, subject to their agreement to abide by all FNMA, GNMA and/or FHLMC rules, procedures and guidelines.  The FNMA, GNMA and FHLMC rules, procedures and guidelines generally do not permit mortgage servicers to impose prepayment penalties on mortgagors.

41.     The OTS has also promulgated regulations for federally-chartered savings and loan associations and holding companies that make prepayment penalties unlawful if not permitted by the loan contract, as is the case here.

42.     Nevertheless, contrary to applicable law and the terms of their mortgage contracts with Plaintiff and the Class, Defendants knowingly and intentionally impose and collect prepayment penalties in the form of fees and finance charges from consumers that prepay mortgages and other loans secured by real property.

43.     Included among those fees is a payoff statement fee imposed on mortgagors and obligors that repay their loans prior to maturity.  In the case of Plaintiff, that fee was $10, and was deceptively described as an "additional loan servicing fee[] … due and owing to Washington

13

Mutual" for "Unpaid Late Charges and/or other fee" in a June 7, 2002 Demand/Payoff Statement provided by "Washington Mutual" to Plaintiff.

44.     The payoff statement fee, no matter how described by Defendants, constitutes an undisclosed finance charge, prepayment penalty, refinancing penalty and payoff fee levied by Defendants on consumers that payoff mortgages or home loans prior to their stated term or maturity. Those fees and penalties would not have been imposed on, or paid by, Plaintiff and the Class had they paid off their mortgages or home loans at maturity rather than at an earlier date.

45.     Defendants also charge and collect a "Recording Fee" for recording the satisfaction of the mortgage originated and/or serviced by Defendants. In Plaintiff's case, that fee was $26.50.  New York law requires that a mortgage satisfaction be recorded within 45 days from the last payment of principle and interest owed on the mortgage.  In the case of Plaintiff, her mortgage was settled and satisfied on or about June 12, 2002.  However, satisfaction of Plaintiff's mortgage was not filed by or for WMBFA until March 3, 2003.  Defendants charge and collect the Recording Fee from Class members, such as Plaintiff, even though Defendants do not comply with the applicable laws for timely recording.

46.     "Washington Mutual" imposed and collected the Recording Fee from Plaintiff, even though the title insurance provider also imposed and collected a $65 recording fee from Plaintiff for recording the satisfaction of Plaintiff's mortgage.

47.     As demonstrated by the HUD-1 Uniform Settlement Statement pertaining to the settlement and satisfaction of her mortgage loan, on June 12, 2002, Plaintiff paid all monies, charges, fees and penalties demanded in the Washington Mutual Demand/Payoff Statement, including the $10 payoff statement fee and $26.50 Recording Fee.

14

48.    That HUD-1 Settlement Statement also demonstrates that Plaintiff paid the $65 recording fee to the title insurance provider to record the satisfaction of her mortgage originated by WMBFA and serviced by one or more Defendants.

49.    Other consumers have complained of Defendants' deceptive and unlawful imposition and collection of fees, charges and penalties imposed by Defendants for prepayment of their mortgage and/or home loans, including payoff statement fees.  One consumer lodged a complaint on Complaints.com noting that Washington Mutual demanded a $60 "Payoff statement fee" in a "Washington Mutual Demand/Payoff Statement" dated August 20, 2003. Another consumer lodged a complaint on Findlaw.com on July 8, 2002 stating that Washington Mutual imposed a $60 payment statement fee and a $10 fee for faxing the payoff statement.

50.    Defendants do not deny imposing and collecting payoff statement fees.  In fact, they admit the practice on their website, stating: "A payoff statement fee may be collected at the time your loan is paid off, if allowed by the state in which your property is located."  New York and other states do not permit such fees and such prepayment penalties are forbidden by the mortgage and note agreements prepared by Defendants.

51.    Plaintiff and the Class were financially injured as a direct and proximate result of Defendants' false, misleading and deceptive acts, practices and conduct (including their breach of mortgage and note agreements) described herein.

52.    To the extent that Plaintiff and Class are not entitled to recover all their damages from Defendants, Plaintiff and the Class have been and will continue to be irreparably injured and have no adequate remedy at law for Defendants' violations of law complained of herein.

15

53.     Aside from the above-discussed conduct, WMI and its subsidiaries are among a group of mortgage banks under investigation by the New York Attorney General for discriminatory mortgage lending practices.

54.     In addition, the United States Department of Labor recently ordered WMI to re-hire and pay damages to a former vice president and national manager in WMI's home loan division, after she was allegedly fired for disclosing illegal lending conduct by WMI and its subsidiaries.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action on behalf of herself and on behalf of all others similarly situated in the United States who had a mortgage or home loan originated, purchased or serviced by any of the Defendants and who wrongfully paid fees, charges, finance charges and/or penalties in breach of their mortgage, note or home loan contracts or in violation of applicable laws and/or regulations (the "Class").  Excluded from the Class are Defendants, their parents, subsidiaries, officers, directors, employees, partners and co-venturers.

56.     This action is brought as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, sub-sections 23(a) and 23(b)(2) and/or (b)(3).  The Class satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

57.     The members of the Class are so numerous that joinder of all Class members is impracticable.  While the exact number of Class members can be determined only by appropriate discovery, Plaintiff believes that members of the Class number at least in the hundreds of thousands of persons, in New York and throughout the United States.

16

58. Because of the geographic dispersion of class members, there is judicial economy arising from the avoidance of a multiplicity of actions in trying this matter as a class action.

59. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff has no interests that are adverse or antagonistic to those of the Class. Plaintiff's interests are to obtain relief for herself and the Class for the harm arising out of the violations of law set forth herein.

60. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in complex and consumer class action litigation.

61. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by each member of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Plaintiff and members of the Class to individually seek redress for the wrongful conduct alleged.

62. In addition, Defendants have acted and refused to act, as alleged herein, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and/or corresponding with respect to the Class as a whole.

63. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)    whether Defendants violated TILA;

    (b)    whether Defendants violated RESPA;

17

(c)    whether Defendants violated New York Real Property Actions and Proceedings Law §274-a or similar laws of other states;

(d)    whether Defendants violated New York Real Property Actions and Proceedings Law §1921 or similar laws of other states;

(e)    whether Defendants violated GBL §349 and/or the similar consumer practice statutes of other states;

(f)    whether Defendants' acts and practices were false, misleading and/or deceptive;

(g)    whether Defendants breached their contractual obligations to Plaintiff and the Class;

(h)    whether Defendants acted willfully, intentionally, knowingly and/or recklessly in failing to abide by the terms of their agreements with Plaintiff and the Class;

(i)    the proper measure of damages to be paid to Plaintiff and the Class;

(j)    whether Plaintiff and the Class are entitled to injunctive or other equitable relief to remedy Defendants' past and continuing violations of law alleged herein; and

(k)    whether Defendants have been unjustly enriched by their inequitable and unlawful conduct, and if so, whether Defendants should be forced to disgorge inequitably obtained revenues or provide restitution.

64.    The Class is readily definable, and prosecution of this action as a class action will reduce the possibility of repetitious litigation.

18

65.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## FRAUDLENT CONCEALMENT AND EQUITABLE TOLLING

66.    Defendants have engaged in fraudulent, misleading and deceptive efforts to conceal the true nature of their unlawful conduct from Plaintiff and the Class.  Defendants have intended to and have in fact accomplished their concealment through misrepresentations and omissions, as described herein.

67.    Included among that deception is Defendants' practice of describing the fees listed in their payoff statements in a manner that should not reasonable alert Class members that Defendants are imposing prepayment penalties and undisclosed finance charges, such as imposing fees for providing payoff statements but describing those fees "Unpaid Late Charges and/or other fees."

68.    Also included among Defendants' acts to conceal their unlawful conduct, Defendants, and in particular WMBFA, did not advise Plaintiff that they filed the satisfaction of Plaintiff's mortgage after the time mandated by law to do so, but nevertheless imposed, collected and retained a Recording Fee for the untimely recording of that mortgage satisfaction.

69.    Due to Defendants' fraudulent concealment and because Defendants represent that the unlawful fees are legitimately charged and collected, Plaintiff has only recently learned of the existence of her claims against Defendants.  For the same reasons, many Class members are likely to be reasonably unaware of Defendants' unlawful acts.

70.    Plaintiff's and the Class' lack of knowledge as to their claims against Defendants is and was not due to any fault or lack of diligence on their part, but rather due entirely or

19

substantially to the acts of Defendants designed to conceal and hide the true nature of their unlawful and inequitable conduct.

## CONTINUING HARM AND INURY

71.     Defendants continue to engage in unlawful conduct and have caused and continue to cause harm and separate injuries to the Class each and every time Defendants, or any one of them, imposes and/or collects unlawful fees, charges and/or penalties on the Class or when Defendants engage in false, misleading, unfair and/or deceptive conduct to perpetrate or conceal their unlawful conduct.

## COUNT I

### (Violations of TILA)

72.     Plaintiff repeats and realleges paragraphs 1 through 71 as though set forth herein.

73.     Plaintiff and each Class member is a "person" as that term is defined in 15 U.S.C. §1602(d) and a "consumer" as that term is defined in 15 U.S.C. §1602(h).

74.     Defendants are each "creditors" as that term is defined in 15 U.S.C. §1602(f).

75.     The mortgage and home loans originated or purchased by Defendants to Plaintiff and the Class are consumer credit transactions, and also "residential mortgage transactions" as that term is defined in 15 U.S.C. §1602(w) and applicable regulations promulgated by the Federal Reserve Board.

76.     The term "finance charge" is defined, in pertinent part, in 15 U.S.C. §1605(a) as "the sum of all charges, payable directly or indirectly by the persons to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit."

20

77.     None of the fees wrongfully charged and collected by Defendants are *bona fide* or reasonable, such that they may be excluded from the accurate disclosure of the finance charge imposed by Defendants on Plaintiff and the Class. In addition, Defendants imposed these fees in amounts that are in excess of the reasonable value of services provided.

78.     15 U.S.C. §§ 1632 and 1638, and applicable regulations, require *inter alia* that creditors accurately, truthfully, completely, clearly and conspicuously disclose all finance charges, prepayment penalties and/or refinancing penalties to consumers in all consumer credit and residential mortgage and home loan transactions.

79.     As alleged herein, Defendants did not accurately, truthfully, completely, clearly and conspicuously disclose the amount of all finance charges, prepayment penalties and/or refinancing penalties in their consumer credit transactions and residential mortgage and home loan transactions with Plaintiff and the Class, including disclosures made by Defendants in loans, notes and mortgages with Plaintiff and the Class, in violation of 15 U.S.C. and §§1632 and 1638.

80.     Defendants' acts, practices and conduct constitute *per se* violations of TILA. Even if not *per se* violations, Defendants' acts, practices and conduct violate TILA.

81.     Plaintiff and the Class have been injured as a result of Defendants' violations of 15 U.S.C. §§1632 and/or 1638.

82.     Plaintiff is entitled to pursue an action and a class action against Defendants pursuant to 15 U.S.C. §1640 to redress Defendants' violations of 15 U.S.C. §§ 1632 and/or 1638.

21

## COUNT II

### (Violations of RESPA)

83.     Plaintiff repeats and realleges paragraphs 1 through 71 as though set forth herein.

84.     Plaintiff and each Class member is a "person" as that term is defined in 12 U.S.C. §2602(5).

85.     The mortgage loans originated and sold by Defendants to Plaintiff and the Class are "federally related mortgage loans" as that term is defined in 12 U.S.C. §2602(1).

86.     Defendants provided "settlement services" to Plaintiff and the Class, as that term is defined in 12 U.S.C. §2602(3) and applicable regulations.

87.     12 U.S.C. §2607(b) of RESPA states, in pertinent part, that: "no person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed."   24 C.F.R. §3500.14(c) construes 12 U.S.C. §2607(b) to also prohibit the charging of "unearned fee[s]."

88.     12 U.S.C. §2610, and applicable regulations, prohibits a lender or servicer from imposing any fee or charge "for or on account of the preparation and submission by such lender or servicer of the statement or statements required (in connection with such loan) by sections 2603 and 2609(c) of this title or by the Truth in Lending Act (15 U.S.C. 1601 *et seq.*)."

89.     As alleged herein, Defendants imposed fees, charges and penalties on Plaintiff and the Class for unearned settlement services and settlement services not provided, which Defendants' mortgage and note contracts stated would not be charged in connection with the prepayment and satisfaction of federally related mortgage loans and which are prohibited by

RESPA and other federal laws and regulations.  In addition, the payoff statement fees, charges and penalties imposed by were in excess of the reasonable value of services provided.

90.     Defendants also violated RESPA by collecting "unearned fees" related to settlement, satisfaction and/or discharge of Plaintiff's and Class members' mortgage loans. Included among those unearned fees are fees imposed, collected and retained by Defendants that were prohibited by law and/or fees that were collected by Defendants that were duplicative of fees imposed and collected by other persons for performing the same or similar settlement services and/or fees for services performed by persons other than Defendants.

91.     Defendants' acts, practices and conduct constitute *per se* violations of RESPA. Even if not *per se* violations, Defendants' acts, practices and conduct violate RESPA.

92.     Plaintiff and the Class have been injured as a result of Defendants' violations of 12 U.S.C. §§ 2607 and 2610.

93.     Plaintiff is entitled to pursue an action and a class action against Defendants pursuant to 12 U.S.C. §§ 2607(d) and 2610 to redress Defendants' violations of RESPA.

## COUNT III

### (Violations of New York Real Property Actions & Proceedings Law §274-a)

94.     Plaintiff repeats and realleges paragraphs 1 through 71 as though set forth herein.

95.     New York Real Property Actions & Proceedings Law §274-a requires that Defendants, as the owners or servicers of Plaintiff's and the Class members' mortgages and/or home loans, provide any mortgagor or their agent with mortgage-related documents concerning the amount necessary to pay off and satisfy a mortgage and/or home loan, upon request by any mortgagor or their agent.

23

96.     New York Real Property Actions & Proceedings Law §274-a does not permit Defendants, as the owner or servicer of Plaintiff's and Class members' mortgage and/or home loans, to charge any fee for providing mortgage-related documents concerning the amount necessary to pay off and satisfy a mortgage and/or home loan owned or serviced by Defendants.

97.     Plaintiff and other Class members had mortgage and home loans originated and serviced by Defendants.

98.     Plaintiff or her agents requested that Defendants provide her with mortgage-related documents concerning the amount necessary to payoff and satisfy a mortgage loan owned and/or serviced by Defendants.

99.     Defendants demanded, imposed and collected fees, charges and penalties from Plaintiff and Class members for providing them a payoff statement.  These fees, in Plaintiff's case, were collected by WMBFA or its affiliates and were shared with and inured to the benefit of WMBFA's parent and affiliate companies.

100.    Defendants' imposition and collection of fees for providing payoff statements to Plaintiff and the Class violate New York Real Property Actions & Proceedings Law §274-a, and caused injury to Plaintiff and Class members.

101.    Plaintiff and the Class are entitled to pursue claims against Defendants pursuant to New York Real Property Actions and Proceedings Law §274-a to redress Defendants' violations of that statute.

102.    Defendants' practices violating New York Real Property Actions and Proceedings Law §274-a have also violated the statutes in states other than New York, causing injury and permitting redress by those Class members residing outside of New York.

24

103.    The application of New York Real Property Actions & Proceedings Law §274-a, and similar laws in other states, in this action, is consistent with OTS regulations and will only incidentally affect (or will not affect in any meaningful manner) the lending operations of any Defendant that is or was a federal savings association.

## COUNT IV

### (Violations of New York Real Property Actions & Proceedings Law §1921)

104.    Plaintiff repeats and realleges paragraphs 1 through 71 as though set forth herein.

105.    New York Real Property Actions and Proceedings Law §1921 requires that after the full repayment of principle, interest and other amounts owed on a mortgage loan, "a mortgagee of real property situate[d] in this state, unless otherwise requested in writing by the mortgagor or the assignee of such mortgage, must execute and acknowledge before a proper officer, in like manner as to entitle a conveyance to be recorded, a satisfaction of mortgage, and thereupon within forty-five days arrange to have the satisfaction of mortgage: (a) presented for recording to the recording officer of the county where the mortgage is recorded, or (b) if so requested by the mortgagor or the mortgagor's designee, to the mortgagor or the mortgagor's designee."

106.    Defendants charged, collected and did not refund a "Recording Fee" from Plaintiff, and other Class members, even though Defendants failed to timely record the satisfaction of mortgage as required by New York Real Property Actions and Proceedings Law §1921.

25

107.   Plaintiff is entitled to pursue claims against Defendants pursuant to New York Real Property Actions and Proceedings Law §1921 to redress Defendants violations of this statute.

108.   Defendants' untimely recording of the satisfaction of Class members' mortgages may also have violated statutes in states other than New York, causing injury and permitting redress by those Class members residing outside of New York.

109.   The application of New York Real Property Actions & Proceedings Law §1921, and similar laws in other states, in this action, is consistent with OTS regulations and will only incidentally affect (or will not affect in any meaningful manner) the lending operations of any Defendant that is or was a federal savings association.

## COUNT V

### (Violations of New York GBL §349 and Similar Laws of Other State)

110.   Plaintiff repeats and realleges paragraphs 1 through 71 as though set forth herein.

111.   Plaintiff and the Class are "persons" within the meaning of GBL §349(h).

112.   GBL §349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

113.   As alleged herein, Defendants engaged in deceptive acts and practices in the form of misrepresentations and omissions during the conduct of business in and from New York in violation of GBL §349(a).

114.   Defendants knew or should have known that their acts, practices, statements, correspondence, invoices and representations, as discussed above, were false and likely to deceive and mislead Plaintiff and the Class.

115.    Plaintiff and the Class have been injured as a result of Defendants' violations of GBL §349(a).

116.    Defendants' deceptive and misleading acts and practices have directly, foreseeably, and proximately caused damages and injury to Plaintiff and the other members of the Class.

117.    Plaintiff is entitled to pursue claims against Defendants pursuant to GBL §349(h) to redress Defendants' violations of GBL §349(a).

118.    Defendants' deceptive and unfair trade practices have also violated the consumer protection statutes in states other than New York, causing injury and permitting redress by those Class members residing outside of New York.

119.    The application of GBL §349, and similar laws in other states, in this action, is consistent with OTS regulations and will only incidentally affect (or will not affect in any meaningful manner) the lending operations of any Defendant that is or was a federal savings association.

## COUNT VI

### (Breach of Contract)

120.    Plaintiff repeats and realleges paragraphs 1 through 71 as though set forth herein.

121.    Plaintiff and the other members of the Class accepted Defendants' offer to borrow monies through mortgages, loans and notes upon the terms stated in the mortgage, loan and note contracts prepared by Defendants.

122.    In these contracts, Defendants represented and agreed that Plaintiff and the Class would not be charged prepayment penalties or fees, but in fact did impose and collect prepayment penalties and fees from Plaintiff and the Class.

123.    In particular, Paragraph 5 of the Fixed/Adjustable Rate Note prepared by Defendants, entitled "BORROWER'S RIGHT TO PREPAY," states that Plaintiff "may make a full prepayment or partial prepayments without paying any prepayment charge."

124.    Moreover, OTS regulation 12 C.F.R. §560.34 does not permit any federal savings association to charge a fee for any prepayment of a loan unless permitted by the loan contract. Here, Defendants' loan contracts state that Defendants will <u>not</u> charge any prepayment penalties.

125.    By reason of Defendants' breaches, Plaintiff and the Class suffered financial injuries.

126.    The application of contract law in this action is consistent with OTS regulations and will only incidentally affect (or will not affect in any meaningful manner) the lending operations of any Defendant that is or was a federal savings association.

## COUNT VII

### (Common Law Unjust Enrichment)

127.    Plaintiff repeats and realleges paragraphs 1 through 71 as though set forth herein.

128.    As alleged herein, Defendants have unjustly benefited from their unlawful and inequitable acts resulting in the payment of money by Plaintiff and the Class members.

129.    Defendants have and are continuing to derive profits and revenues resulting from their false, misleading, deceptive, unfair and inequitable conduct.

28

130.   It would be inequitable for Defendants to be permitted to retain any of the proceeds derived as a result of their unlawful conduct.

131.   Defendants should be compelled to provide restitution to the Class members and/or to disgorge into a common fund or constructive trust for the benefit of Plaintiff and the Class, all proceeds received by them from any unlawful or inequitable act described in this Complaint which has inured and continues to inure to the unjust enrichment of Defendants.

132.   Defendants should also be enjoined from continuing to engage in any unlawful or inequitable act alleged in this Complaint.

133.   The application of common law unjust enrichment in this action is consistent with OTS regulations and will only incidentally affect (or will not affect in any meaningful manner) the lending operations of any Defendant that is or was a federal savings association.

## COUNT VIII

### (Common Law Fraud)

134.   Plaintiff repeats and realleges paragraphs 1 through 71 as though set forth herein.

135.   As alleged herein, Defendants intentionally, willfully, knowingly and recklessly charged and collected fees for services that Defendants' contracts unambiguously stated would not be charged.

136.   Defendants drafted the mortgage, loan and note contracts and possessed superior bargaining power and knowledge as to Defendants' mortgage and home loan transactions with Plaintiff and the Class.  Defendants used such unequal power and knowledge to take advantage and defraud consumers into paying fees and charged Defendants knew were not owed.

29

(5)    Declaring that Defendants have engaged in the unlawful and inequitable conduct alleged herein;

(6)    Ordering Defendants to make restitution and/or disgorge into a common fund or a constructive trust all monies paid by Plaintiff and the Class to the full extent to which Defendants were unjustly enriched by their unlawful and inequitable conduct alleged herein;

(7)    Granting Plaintiff and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' and experts' fees; and

(8)    Granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff and the Class demand a trial by jury on all issues so triable.

Dated: New York, New York
       June 6, 2005

WHALEN & TUSA, P.C.

Joseph S. Tusa (JT 9390)
Paul C. Whalen (PW 1300)
90 Park Avenue
New York, NY  10016
Tel. (212) 786-7377
Fax. (212) 658-9685

- and –

565 Plandome Road
Suite 212
Manhasset, NY  11030

Attorneys for Plaintiff

32