IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DENISE CASSESE f/k/a DENISE CALIGIURI, GEORGE SCOTT RUSH, RICHARD SCHROER and WILLIAM BLOOM, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>                v.<br><br>WASHINGTON MUTUAL, INC.; and<br><br>THE FEDERAL DEPOSIT INSURANCE COMPANY, in its capacity as receiver for WASHINGTON MUTUAL BANK, such entity having incorporated former defendants WASHINGTON MUTUAL BANK, FA and WASHINGTON MUTUAL HOME LOANS, INC.,<br><br>                Defendants. | Civil Action No. 05-02724<br><br>Arthur D. Spatt, USDJ<br>Arlene R. Lindsay, USMJ<br><br><br>**JURY TRIAL DEMANDED** |

## THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs Denise Cassese, George Scott Rush, Richard Schroer and William Bloom (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, for their complaint against Washington Mutual, Inc. ("WMI"), the Federal Deposit Insurance Commission ("FDIC") (as substituted defendant for Washington Mutual Bank, FA ("WMBFA") a/k/a Washington Mutual Bank ("WMB") and a/k/a Washington Mutual Home Loans, Inc. ("WMHLI")), allege upon information and belief, except as to the allegations that pertain to Plaintiffs and their counsel, which claims are based on personal knowledge, as follows:[1]

---

[1]       Insofar as the Court has dismissed Plaintiffs' claims against other defendants originally-named in this action, those defendants are not named as parties in this Third Amended Complaint, however, Plaintiffs preserve for

**INTRODUCTION**

1.      During all relevant times,[2] Defendants engaged in the practice of mortgage

banking, home loan lending and loan servicing in New York, New Jersey, North Carolina,

Oregon and other states.  This practice involves initiating, originating, purchasing or acquiring

loans, keeping a small number of those loans for their own portfolio and "reselling" the large

majority to the Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"), the

Government National Mortgage Association ("GNMA" or "Ginnie Mae"), Federal National

Mortgage Association ("FNMA" or "Fannie Mae") or the Federal Home Loan Bank ("FHLB").

Following resale or acquisition of the servicing rights, Defendants act or acted as the "servicer"

of the loans.

2.      When applying for their mortgages, residential loans or lines of credit, Plaintiffs

and the WMI Class (defined in ¶113) and WMB Class[3] (defined in ¶111) (collectively, the

"Classes") received uniform loan contracts and notes prepared by Defendants or other lenders,

specifying the fees, finance charges and prepayment penalties, if any, Defendants could charge

for the servicing, satisfaction, discharge, settlement and recording of loans, among other fees and

---

appeal, and expressly do not waive, their claims against the originally-named defendants in this action or their
successors.

[2]      Plaintiffs use the past tense in this Complaint to describe defendants' activities during the class period.
This convention is not meant to be construed as limiting Plaintiffs' allegations to past conduct.  Insofar as any of the
defendants continue to charge any of the fees identified herein, Plaintiffs intend that conduct to be within the scope
of their allegations and class claims.

[3]      Plaintiffs recognize that the Court decertified the WMB Class by order entered May 13, 2010.  They refer
to the WMB Class here only to preserve their appellate or Fed. R. Civ. P. 23 rights with respect to the Court's class
certification rulings, orders and decisions.

costs.  These uniform loan contracts and notes were prepared by Defendants or other banks and contained the parties' rights and obligations, as constrained by applicable law.

3.      In the Fixed/Adjustable Rate Note prepared by WMB f/k/a WMBFA for Plaintiff Cassese, under the section entitled "BORROWER'S RIGHT TO PREPAY," the Note states that Plaintiff Cassese "may make a full prepayment or partial prepayments without paying any prepayment charge."  Substantially similar statements appear in the Notes, Mortgages and/or Deeds of Trust prepared by Defendants or other lenders for other Plaintiffs and the members of the Classes.

4.      Defendants routinely charged consumers prepayment fees, charges and penalties not permitted by their loan and note contracts, not permitted by federal and state laws, not permitted by regulations of the Office of Thrift Supervision ("OTS") and not permitted for loans sold to FNMA, GNMA, FHLMC and FHLB.

5.      The fees improperly charged and collected are in practice and practical effect undisclosed finance charges, prepayment penalties, refinancing penalties, unearned settlement fees and payoff statement fees levied by Defendants on consumers that payoff mortgages and home loans prior to maturity.

6.      Prior to satisfaction and settlement of Plaintiffs' and the members of the Classes' home loans, mortgage loans, co-op loans, home equity loans and home equity lines of credit, Defendants, acting as the "servicer" of the loans, sent Plaintiffs and other members of the classes a statement containing the amount necessary to pay off the loans and demanding payment of various fees, charges and penalties imposed and collected by Defendants.  Some of those fees related to the discharge, satisfaction or prepayment of the mortgages and/or residential loans, and

are, thus, improper under the mortgage, deed of trust and/or note agreements and applicable laws and agreements between Defendants and FNMA, GNMA, FHLMC and/or FHLB.  Others were for faxing or preparing Demand/Payoff Statements, and were expressly prohibited by state laws. Still other fees were demanded and collected for recording loan satisfactions or lien releases that were improperly charged to the extent that Defendants did not record the satisfactions or releases (often the borrower's title company or another third party performs that task) or did not timely record the mortgage satisfactions or releases in accordance with applicable law.

7.       Defendants did not advise consumers that Defendants resell or resold many of the mortgage and home loans they originate to FNMA, GNMA, FHLMC and FHLB.  Nor did they inform Plaintiffs and the members of the Classes when Defendants charged and collected improper and unlawful fees.   To the contrary, Defendants routinely made affirmative misrepresentations about such fees.   As a result of Defendants' misrepresentations and omissions, Plaintiffs and the members of the Classes remained reasonably unaware that the fees, charges and penalties Defendants imposed and collected were improper under their loan and note agreements and applicable laws.

8.       Defendants acted deceptively and unfairly in furtherance of their scheme to collect unearned and improper fees, charges and penalties from Plaintiffs and the members of the Classes.  Defendants also misrepresented and/or omitted material facts in their standardized loan and note documents provided to Plaintiffs and the members of the Classes.  Plaintiffs and the members of the Classes were injured as a result of Defendants' acts, practices and conduct in an amount believed to exceed $5,000,000, exclusive of interest and costs.

9.     Plaintiffs and the members of the Classes seek damages and equitable relief for Defendants' continuing and past violations of the Truth In Lending Act, 15 U.S.C. § 1601 ("TILA"), the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 ("RESPA"), New York Real Property Actions & Proceedings Law § 1921 (and the similar consumer protection laws of other jurisdictions), New York Real Property Law § 274-a (and the similar consumer protection laws of other jurisdictions), New York General Business Law ("GBL") § 349 (and the similar consumer protection laws of other jurisdictions), breach of contract and unjust enrichment.[4]

## JURISDICTION AND VENUE

10.     Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331 & 1332(d), 15 U.S.C. § 1640(e) and 12 U.S.C. §§ 2607(d), 2610, and 2614.  Plaintiffs invoke the Court' supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' and the members of the Classes' state law claims as they are so related to the federal claims in this action that they form the same case or controversy under Article III of the United States Constitution.

11.     This Court possesses personal jurisdiction over each Defendant based on each Defendant's residence, presence, transaction of business and contacts within the United States, New York and/or this District.  Numerous Defendants, including WMB f/k/a/ WMBFA, have availed themselves of the New York courts by commencing actions in the New York federal and state courts.

---

[4]     Plaintiffs acknowledge that the Court previously dismissed claims arising under RESPA, New York Real Property Actions & Proceedings Law §1921 (and the similar consumer protection laws of other jurisdictions), and New York Real Property Law §274-a (and the similar consumer protection laws of other jurisdictions).  They allege them herein nonetheless to preserve those claims for appeal.

5

12.     Venue is proper in this District under 28 U.S.C. §1391 because Defendants maintain or maintained offices in this District, at all times conducted substantial business in this District, and because a substantial part of the events and omissions giving rise to this action occurred in this District.

## TRADE AND COMMERCE

13.     In connection with Defendants' origination, sale, resale, servicing and solicitation, of mortgage and home loans, monies, contracts, bills and other forms of business communications and transactions were transmitted in a continuous and uninterrupted flow across state lines.

14.     Various means and devices were used to effectuate the violations of law alleged herein, including the United States mail, interstate travel, interstate telephone commerce and other forms of interstate electronic communications.  The activities of Defendants alleged herein were within the flow of, and have substantially affected, interstate commerce.

## PARTIES

**Plaintiffs**

15.     Denise Cassese, f/k/a Denise Caliguiri ("Cassese"), a Nassau County, New York resident, became a mortgagor of WMB f/k/a WMBFA in August 1998.  In a May 14, 2002 payoff statement, "Washington Mutual" demanded that Cassese pay a list of amounts "required to pay [her] loan in full . . . ."  Included among the "required" payoff amounts were a "Fax Fee" of $10 and a "Recording Fee" of $26.50.  Cassese paid these fees, unaware that such payments were not due to "Washington Mutual", and has been injured as a result of the false, deceptive,

misleading and unconscionable acts and practices and breach of the mortgage and note agreements pertaining to Cassese's mortgage loan originated by WMB f/k/a WMBFA.

16. In another June 7, 2002 Payoff Statement, Cassese received a second demand from "Washington Mutual" listing the amounts "required to pay [her] loan in full" and "the additional loan servicing fees that are due and owing to Washington Mutual relating to this transaction." Included among the "additional loan servicing fees" was a $10 fee described as a fee for "Unpaid Late Charges and/or other fees" and a "Recording Fee" of $26.50. As stated earlier, Cassese paid these fees, unaware that such payments were not due.

17. George Scott Rush ("Rush"), a New Jersey resident, became a mortgagor of WMB f/k/a WMBFA in March 2000. In a October 17, 2001 Payoff Statement dated, "Washington Mutual" demanded from Rush a list of the amounts "required to pay [his] loan in full." Included among those "required" amounts was a Payoff Statement Fee of $60 and a "Recording Fee" of $20.00. Rush paid these fees, unaware that such payments were not due to "Washington Mutual", and has been injured as a result of the false, deceptive, misleading and unconscionable acts and practices and breach of the Mortgage and Note agreements pertaining to Rush's mortgage loan originated by WMB f/k/a WMBFA.

18. Richard Schroer ("Schroer") is a resident of North Carolina. On or about April 25, 2002, Schroer obtained a residential loan from Cunningham & Company. In a "Notice of Sale" dated that same day, Schroer was advised that the servicing of his loan was transferred to "Washington Mutual." In a September 17, 2003 Payoff Statement, "Washington Mutual" demanded from Schoerer a list of the amounts "required to pay [his] loan in full" and the "additional loan servicing fees that are due and owing to Washington Mutual relating to this

7

transaction." Included among those "loan servicing fees" was a Payoff Statement Fee of $60. Schroer paid this fee, unaware that it was not due to "Washington Mutual", and has been injured as a result of the false, deceptive, misleading and unconscionable acts and practices and breach of the Deed of Trust and Note agreements pertaining to Schroer's mortgage loan acquired by WMB f/k/a WMBFA.

19.    William Bloom ("Bloom") is a resident of Oregon.  On or about October 12, 1993, Bloom and his wife obtained a residential loan from West One Bank, which loan was sold to WMB f/k/a WMBFA, after which time WMB f/k/a WMBFA serviced Bloom's loan. Mortgage Interest Statements provided by WMB f/k/a WMBFA to Bloom and his wife listed "Washington Mutual Bank, FA" as the "lender," confirming that WMB f/k/a WMBFA had purchased Bloom's mortgage.  In an August 27, 2002 Payoff Statement, "Washington Mutual" and WMB f/k/a WMBFA demanded from Bloom a list of the amounts "required to pay this loan in full."  Included among those "required" amounts was a Payoff Statement Fee of $120.  Bloom paid this fee, and has been injured as a result of Defendants' violations of the TILA, false, deceptive, misleading and unconscionable acts and practices and breach of the Deed of Trust and Note agreements pertaining to Bloom's mortgage loan acquired by WMB f/k/a WMBFA.

**Defendants**

20.    WMI is a Washington corporation that maintains its principle place of business and headquarters at 1201 Third Avenue, Seattle, Washington.  WMI was the largest savings and loan holding company in the United States, and through its current or past subsidiaries was the largest mortgage servicer in the nation.  WMI was publicly traded on the New York Stock Exchange under the symbol "WM."   WMI was the parent company of each of the other

8

Defendants (save for the FDIC), and actively supervised and controlled each of their activities and operations.  WMI admitted in its SEC Form 10-K for the year ended December 31, 2004 and in other pubic financial statements that "All of [its] banking subsidiaries are under the common control of Washington Mutual, Inc."  A June 30, 2005 WMI press release also confirmed that WMI officers and executives actively managed and controlled WMI's home lending business by stating that the President of WMI's "Home Loans Division" will "oversee all aspects of the company's home loans business."  WMI reported the operating results of the other Defendants (save for the FDIC) in WMI's publicly-filed financial statements.  WMI individually and through its subsidiaries engaged in substantial residential lending business nationwide and within this District.  In a January 27, 2005 press release, WMI boasted that:  "Washington Mutual currently operates more than 2,400 retail banking, mortgage lending, commercial banking and financial services offices throughout the nation."  WMI maintained offices and employees in New York related to its mortgage and home loan lending and servicing operations.

21.    WMB f/k/a WMBFA was a Washington corporation that maintained its principle place of business and headquarters in Stockton, California. In January 2005, WMBFA merged with state-charted WMB and was renamed "Washington Mutual Bank." ("WMB").  WMB f/k/a WMBFA maintained offices in multiple states and engaged in the retail mortgage banking business nationwide.  WMB f/k/a WMBFA was a federally-chartered savings association, a member of both the Federal Home Loan Bank System and the San Francisco Federal Home Loan Bank.  WMB f/k/a WMBFA's business included attracting retail deposits from the general public and investing those deposits in residential mortgage and home loans originated and sold by WMB f/k/a WMBFA and its parent and/or affiliate companies.  WMBFA also acted as the

9

servicer of mortgage and residential home loans, both before and after it resold those loans in the secondary market. WMB f/k/a WMBFA was a wholly-owned subsidiary of WMI, was controlled by WMI and reported its financial results in WMI's publicly-filed financial statements. WMB f/k/a WMBFA engaged in substantial business nationwide and within this District.  Prior to 1997, WMB f/k/a WMBFA was known as American Savings Bank, F.A.  WMB f/k/a WMBFA maintained offices and employees in New York related to its mortgage and home loan lending and servicing operations.  The FDIC, by virtue of its receivership, has succeeded to the interest of WMB f/k/a WMBFA and has been substituted in this action as a defendant for WMB f/k/a WMBFA, state-chartered WMB and WMHLI.

22.    State-chartered WMB was a Washington corporation and Washington state-chartered savings bank that maintained its principle place of business and headquarters at 1201 Third Avenue, Seattle, Washington. State-chartered WMB maintained offices in multiple states and engaged in the business of mortgage banking nationwide. State-chartered WMB's business included attracting retail deposits from the general public and investing those deposits in residential mortgage and home loans originated and sold by state-chartered WMB and its affiliate companies. State-chartered WMB also acted as the servicer of mortgage and residential home loans, both before and after it resold those loans in the secondary market. State-chartered WMB was a wholly-owned subsidiary of WMI, who controlled state-chartered WMB and reported its financial results in WMI's publicly-filed financial statements. State-chartered WMB engaged in substantial business nationwide and within this District.  It maintained "home loan centers" throughout this District, including offices in Bayside, Brooklyn, Garden City, Hauppauge and Melville.  In January 2005, state-chartered WMB merged with WMBFA,

retaining the name "Washington Mutual Bank." The FDIC, by virtue of its receivership, succeeded to the interests of WMB and has been substituted as a defendant in this action for WMB f/k/a WMBFA, and for state-chartered WMB in its capacity as a subsidiary of WMB f/k/a WMBFA.

23.     WMHLI was an Ohio corporation registered with the New York Department of State as a foreign business corporation beginning in 1989.  WMHLI maintained its principal place of business and headquarters at 1201 Third Avenue, Seattle, Washington.  WHMLI maintained offices in multiple states and engaged in the business of mortgage banking nationwide.  WMHLI was formed as a result of WMBFA's acquisition of the mortgage origination and securitization operations of PNC Financial Services Group on January 31, 2001. WMBLI thereafter acquired Fleet Mortgage Corporation on June 1, 2001.  WMHLI merged into WMB f/k/a WMBFA on March 1, 2002.  Prior to that time, it operated as a wholly-owned subsidiary of WMI, which controlled WMBLI and reported WMBLI's financial results in WMI's publicly-filed financial statements. The FDIC, by virtue of its receivership, succeeded to the interests of WMBHI and has been substituted as a defendant in this action for WMHLI, in its capacity as a subsidiary of WMB f/k/a WMBFA.

24.     The FDIC, in its capacity as Receiver for WMB f/k/a WMBFA, filed a notice on October 24, 2008 to be substituted as a defendant in this action for WMB f/k/a WMBFA, state-chartered WMB and WMHLI.  On September 25, 2008, the FDIC was appointed as the Receiver for WMB f/k/a WMBFA by the Office of Thrift Supervision ("OTS"), upon the seizure of WMB f/k/a by the OTS.  Prior to September 25, 2008, state-chartered WMB and WMHLI had been subsumed into and/or subsidiaries of WMB f/k/a WMBFA.

25.     As of September 25, 2008, as set forth in a "Purchase and Assumption Agreement" among the FDIC, FDIC as Receiver for WMB f/k/a WMBFA and JPMorgan Chase Bank, N.A. ("JMPC"), JPMC acquired certain assets and liabilities of WMB.  Among the assets and liabilities acquired and assumed by JPMC was all the stock of Washington Mutual Bank fsb ("WMBfsb") and all of the loans and servicing rights previously owned or by WMB f/k/a WMBFA, WMHLI and state-chartered WMB.   JPMC presently services the loans for the members of the Classes with outstanding loans as of September 25, 2008.  JPMC was paid and retains all Disputed Fees demanded by the various "Washington Mutual" entities in "Washington Mutual Demand / Payoff Statements, sent prior to September 25, 2008, but which were paid by the members of the Classes after September 25, 2008.

## FACTUAL ALLEGATIONS

### *The Creation of Washington Mutual As The Nation's Largest Mortgage Lender and Servicer*

26.     According to WMI, as of "December 31, 2004 we were the largest thrift holding company in the United States and the seventh largest among all U.S.-based bank and thrift holding companies."  WMI explained that its "earnings are primarily driven by real estate secured lending and deposit taking activities which generate net interest income and by activities that generate noninterest income, including the sale and servicing of loans and providing fee-based services to our customers. Real estate secured loans and mortgage-backed securities generate more than 90% of interest income and this concentration is likely to continue as a result of our decision to exit certain non-core businesses, such as lending to mid- and large-sized companies."

27. WMI had become the nation's largest mortgage servicer and mortgage lender through a combination of aggressive acquisitions and retail growth. Its acquisitions included the following banks, savings and loans and other institutions:

- HomeSide Lending, Inc., Florida, 2002
- Dime Bancorp, Inc., New York, 2002
- Fleet Mortgage Corp., South Carolina, 2001
- Bank United Corp., Texas, 2001
- PNC Mortgage, Illinois, 2001
- Alta Residential Mortgage Trust, California, 2000
- Long Beach Financial Corp., California, 1999
- Industrial Bank, California, 1998
- H.F. Ahmanson (Home Savings of America), California, 1998
- Great Western Financial Corp., 1997
- United Western Financial Group, Inc., Utah, 1997
- Keystone Holdings, Inc. (American Savings Bank), California, 1996
- Utah Federal Savings Bank, 1996
- Western Bank, Oregon, 1996
- Enterprise Bank, Washington, 1995
- Olympus Bank fsb, Utah, 1995
- Summit Savings Bank, Washington, 1994
- Far West Federal Savings Bank, Oregon, 1994
- Pacific First Bank, Ontario, 1993
- Pioneer Savings Bank, Washington, 1993
- Great Northwest Bank, Washington, 1992
- World Savings & Loan Association, California, 1992
- Sound Savings & Loan Association, Washington, 1991
- CrossLand Savings fsb, Utah, 1991
- Vancouver Federal Savings Bank, Washington, 1991
- Williamsburg Federal Savings Association, Utah, 1990
- Frontier Federal Savings Association, Washington, 1990
- Old Stone Bank of Washington, FSB, Rhode Island, 1990
- Columbia Federal Savings Bank, Washington, 1988
- Shoreline Savings Bank, Washington, 1988
- Lincoln Mutual Savings Bank, Washington, 1985
- United Savings Bank, Washington, 1983

28. Commenting on the growth of its mortgage and home loan origination and servicing business, WMI stated as follows in its 2004 SEC Form 10-K:

Following the acquisition of the three largest California-based thrift institutions in the latter part of the 1990s, we continued to expand nationally by acquiring companies with strong retail banking franchises in Texas and the greater New York metropolitan area. During this period, we developed and launched our award-winning and innovative retail banking stores that serve customers in an open, free-flowing retail environment. With the goal of combining our strengths as a deposit taker and portfolio lender with those of a mortgage banker, we also expanded our presence in the home loan origination and servicing businesses through acquisition. These mortgage banking acquisitions also served to further broaden our national footprint.

29.    While WMI had grown substantially from acquisitions, consumers suffered from a host of deceptive practices.  According to a December 31, 2001 article appearing in *Business Week*, "[b]uying businesses to acquire customers has been a core strategy for WaMu."  However, the article continues, "[a]s the budding financial services giant has done a flurry of deals to acquire rivals throughout the country, including some with troubled business practices, it appears that problems at those units haven't always been resolved."

30.    WMI organized its operations into three operating segments:  i) the Mortgage Banking Group; ii) the Retail Banking and Financial Services Group; and iii) the Commercial Group.

31.    The WMI Mortgage Banking Group's main activities included:  i) originating and servicing home loans; ii) buying and selling home loans in the secondary market; and iii) selling insurance-related products and participating in reinsurance activities with other insurance companies.

32.    The WMI Retail Banking and Financial Services Group was responsible for "managing and servicing home equity loans and lines of credit" among other activities.

33.    WMI described its mortgage serving business as follows:

14

Mortgage servicing involves the administration and collection of home loan payments. In servicing home loans we collect and remit loan payments, respond to borrower inquiries, apply the collected principal and interest to the individual loans, collect, hold and disburse escrow funds for payment of property taxes and insurance premiums, counsel delinquent customers, supervise foreclosures and property dispositions and generally administer the loans. In return for performing these functions, we receive servicing fees and other remuneration. The Mortgage Banking Group performs home loan servicing activities for substantially all of the Company's managed portfolio – whether the home loans are held in portfolio or have been sold to secondary market participants.

34.     As of December 31, 2003, WMI and its subsidiaries owned mortgage loans valued at $113.02 billion, increasing to $129.13 billion as of December 31, 2004.  It also owned approximately $44 billion of home equity loans.  WMI and its subsidiaries serviced an even greater amount of mortgage and residential home loans, including those sold to FNMA, GNMA, FHLMC and FHLB.

35.     WMI's Mortgage Banking Group generated substantial revenues and profits, including the unlawful fees, penalties and charges collected from consumers having mortgage and home loans serviced by WMI and its former subsidiaries.   In fact, WMI ranked as the largest originator and servicer of mortgages in the entire United States until some time in 2004.

36.     WMI and its subsidiaries reported annual net income of $2.88 billion in 2004 and $3.88 billion in 2003.  For those years, respectively, WMI's profits from its Mortgage Banking segment were $570 million and $1.30 billion.  As stated in WMI's 2004 SEC Form 10-K: "Home loan mortgage banking income was $1.39 billion in 2004, a decrease of $587 million from $1.97 billion in 2003. … This resulted in a decline in gain from mortgage loans from $1.25 billion in 2003 to $649 million in 2004."

15

37.     In its 2004 SEC Form 10-K, WMI reported loan servicing income in excess of $1.9 billion in 2004, $2.2 billion in 2003 and $2.2 billion in 2002.

38.     In an effort to manage risk on its loan portfolio and to expand its ability to make more loans, Defendants generally ressold the mortgage and home loans they originated or purchased and thereafter assumed "serviced" the mortgages, by collecting the monthly mortgage payments and handling customer relations for which they received fees from the owner of the loans and the mortgagors, and other fees, penalties and charges imposed on consumers.

39.     In its SEC Form 10-K for the period ended December 31, 2002, WMI stated: "We generally sell newly originated fixed-rate home loans and hybrid home loans to the Federal National Mortgage Association ('Fannie Mae'), a government sponsored enterprise."  In its 2004 Form 10-K, WMI confirmed that its: "Fixed-rate home loans, which subject us to more interest rate risk than other types of home loans, are generally sold as part of our overall asset/liability risk management process."

40.      In its 2004 SEC Form 10-K, WMI stated that its:  "Home loans are either sold to the Retail Banking and Financial Services Group or are sold to secondary market participants, including the housing government-sponsored enterprises – such as the Federal National Mortgage Association ('Fannie Mae'), the Federal Home Loan Mortgage Corporation ('Freddie Mac') and the regional branches of the Federal Home Loan Banks."

41.     As reported in its SEC Form 10-K, a Form 10-K/A filed on May 22, 2008, WMI and its subsidiaries reported assets of $327.913 billion.

***Defendants Charge Improper, Undisclosed and
Unearned Fees, Finance Charges and Penalties***

42.     On or around August 28, 1998, Cassese entered into a mortgage loan by signing an Adjustable Interest Rate Mortgage and Fixed/Adjustable Rate Note with WMB f/k/a WMBFA to borrow money to purchase a residence in Nassau County, New York.  Both documents were prepared entirely by WMB.

43.     The Adjustable Interest Rate Mortgage provided by WMB f/k/a WMBFA to Plaintiff Cassese was a standardized Fannie Mae/Freddie Mac form mortgage contract and was modified only on the first and last pages as to terms of dollar amount of the Note and specifics about the borrower and the property.  The standard form contract was titled "New York—Single Family—FNMA/FHLMC  UNIFORM  INSTRUMENT"  and  "Form  3033  10/91."   This Adjustable Interest Rate Mortgage contained a choice of law provision stating that federal and New York law would apply, and contains references to specific New York statutes.  This uniform mortgage, and others created by the FHLMC, FNMA, GNMA and/or FHLB, were routinely used by Defendants to originate residential mortgage loans.

44.     The Fixed/Adjustable Rate Note provided by WMB f/k/a WMBFA to Cassese was a standardized agreement prepared by WMB and was modified only on the first and last pages as to the dollar amount of the Note and specifics about the borrower and the property.  Paragraph 11 of the Fixed/Adjustable Rate Note, entitled "UNIFORM SECURED NOTE," states:  "This Note is a uniform instrument with limited variations in some jurisdictions."

45.     Paragraph 5 of the Fixed/Adjustable Rate Note provided to Plaintiff Cassese, "BORROWER'S RIGHT TO PREPAY," states that Plaintiff Cassese "may make a full prepayment or partial prepayments without paying any prepayment charge."

46.     On or around March 9, 2000, Rush entered into a conventional fixed-rate mortgage loan by signing a Mortgage and Note with WMB f/k/a WMBFA to borrow money to purchase a residence in Jersey City, New Jersey.

47.     The Mortgage provided by WMB f/k/a WMBFA to Rush was a standardized Fannie Mae/Freddie Mac form mortgage contract prepared by WMB f/k/a WMBFA and was modified only on the first and last pages and "Schedule A" as to the dollar amount of the Note and specifics about the borrower and the property.  The standard form contract was titled "New Jersey—Single Family—Fannie Mae / Freddie Mac UNIFORM INSTRUMENT" and "Form 3031 9/90."  This Mortgage contained a choice of law provision stating that federal and New Jersey law would apply, and contains references to specific New Jersey statutes.  This uniform mortgage, or others created by the FHLMC, FNMA, GNMA and/or FHLB, were routinely used by Defendants to originate residential mortgage loans.

48.     The Note provided by WMB f/k/a WMBFA to Rush was a standardized agreement entitled MULTISTATE FIXED RATE NOTE – Single Family, and was prepared by WMB and modified only on the first and last pages as to the dollar amount of the Note and specifics about the borrower and the property.  Paragraph 10 of the Note, entitled "UNIFORM SECURED NOTE," states:  "This Note is a uniform instrument with limited variations in some jurisdictions."

49.    Paragraph 4 of the Note provided to Rush, "BORROWER'S RIGHT TO PREPAY," states that Rush "may make a full prepayment or partial prepayments without paying any prepayment charge."

50.    In addition, New Jersey law, incorporated into Plaintiff Rush's Mortgage and Note and the similar standardized mortgages and notes used by Defendants in New Jersey, provides that:  "Prepayment of a mortgage loan may be made by or on behalf of a mortgagor at any time without penalty."

51.    On or around April 25, 2002, Schroer entered into a mortgage loan by signing a Deed of Trust and Note with Cunningham & Company to borrow money to purchase a residence in Kernersville, North Carolina.

52.    The Deed of Trust provided by Cunningham & Company to Schroer was a standardized Fannie Mae/Freddie Mac form mortgage contract prepared by Cunningham & Company and was modified only as to the dollar amount of the Deed of Trust and specifics about the borrowers and the property.  The standard form contract was titled "NORTH CAROLINA— Single Family—Fannie Mae / Freddie Mac UNIFORM INSTRUMENT WITH MERS" and "Form 3034 1/01."  This Deed of Trust contained a choice of law provision stating that federal and New Carolina law would apply to the Deed of Trust.  The rights to service Schroer's loan was sold, assigned and transferred to "Washington Mutual" on April 25, 2002.

53.    The Note provided by Cunningham & Company to Schroer was a standardized agreement entitled MULTISTATE FIXED RATE NOTE – Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT, and was prepared by Cunningham & Company and modified only as to the dollar amount of the Note and specifics about the borrowers and the property.

Paragraph 10 of the Note, entitled "UNIFORM SECURED NOTE," states:  "This Note is a uniform instrument with limited variations in some jurisdictions."

54.     Paragraph 4 of the Note provided to Schroer, "BORROWER'S RIGHT TO PREPAY," states that Schroer "may make a full Prepayment or partial Prepayments without paying a Prepayment charge."

55.     On or around October 12, 1993, Bloom and his wife entered into a mortgage loan by signing a Deed to Trust and Note with West One Bank to borrow money to purchase a residence in Portland, Oregon.

56.     The Deed of Trust provided by West One Bank to Bloom was a standardized Fannie Mae/Freddie Mac form mortgage contract prepared by West One Bank and was modified only as to the dollar amount of the Deed of Trust and specifics about the borrowers and the property. The standard form contract was titled "OREGON — SINGLE FAMILY – FNMA / FHLMC UNIFORM INSTRUMENT" and "Form 3038 9/90."  This Deed of Trust contained a choice of law provision stating that federal and Oregon law would apply to the Deed of Trust.

57.     The Note provided by West One Bank to Bloom was a standardized agreement titled "MULTISTATE FIXED RATE NOTE – Single Family – FNMA / FHLMC UNIFORM INSTRUMENT" and "Form 3200 12/83" and was prepared by West One Bank and modified only as to the dollar amount of the Note and specifics about the borrowers and the property. Paragraph 10 of the Note states:  "This Note is a uniform instrument with limited variations in some jurisdictions."

58.     Paragraph 4 of the Note provided to Bloom, "BORROWER'S RIGHT TO PREPAY," states that Bloom "may make a full prepayment or partial prepayments without paying any prepayment charge."

59.     Following the origination of Bloom's mortgage loan by West One Bank, Bloom's loan was sold to WMB f/k/a WMBFA.  Mortgage Interest Statements provided to Bloom and his wife by WMB f/k/a WMBFA for Bloom's mortgage loan list WMB f/k/a WMBFA as the "lender." The Mortgage Interest Statements provided by WMB f/k/a WMBFA to Bloom and his wife list the same loan number as was listed on the Demand/Payoff Statement provided by WMB f/k/a WMBFA to Bloom and his wife.

60.     Defendants admit in their filings with the Securities and Exchange Commission ("SEC") and other public statements that they generally sell or sold the mortgages they originate into the secondary market dominated by FNMA, GNMA, FHLMC and FHLB.  Following those sales, Defendants often become the servicer of those mortgages, subject to their agreement to abide by all FNMA, GNMA, FHLMC and/or FHLB rules, procedures and guidelines.   The FNMA, GNMA, FHLMC and FHLB rules, procedures and guidelines generally do not permit mortgage servicers to impose prepayment penalties on mortgagors.

61.     The OTS has also promulgated regulations for federally-chartered savings and loan associations and holding companies that make prepayment penalties unlawful if not permitted by the loan contracts, as is the case here.

62.     Nevertheless, contrary to applicable law and the terms of their mortgage contracts with Plaintiffs and the members of the Classes, Defendants knowingly and intentionally imposed

and collected prepayment penalties in the form of fees and finance charges from consumers that prepay mortgages and other loans secured by real property.

63.     Included among those fees are Payoff Statement Fees and Fax Fees imposed on mortgagors and obligors that repay their loans prior to maturity.  In the case of Cassese, her Payoff Statement Fee and Fax Fee was $10, and was deceptively described as an "additional loan servicing fee[] … due and owing to Washington Mutual" for "Unpaid Late Charges and/or other fee" in a June 7, 2002 Demand/Payoff Statement.  That same fee was described as a Fax Fee in the May 12, 2002 Demand/Payoff Statement provided by "Washington Mutual" to Cassese. New York Real Property Law § 274-a prohibits a lender from charging any fee for providing a borrower with an initial payoff statement.

64.     In the case of Rush, his Payoff Statement Fee was $60 as demanded by "Washington Mutual" in an October 17, 2001 Demand/Payoff Statement.  That same fee was described as an "ORIG/AMENDED DEMAND" in a July 8, 2002 Customer Account Activity Statement provided by "Washington Mutual" to Rush.  New Jersey law, N.J.S.A. § 46:10B-25(f) prohibits a lender from charging any fee for providing a borrower with a payoff statement and N.J.S.A. § 46:10B-2 permits a borrower to prepay a mortgage at any time without penalty.

65.     In the case of Schroer, that Payoff Statement Fee was $60 as demanded by "Washington Mutual" in a September 26, 2003 Demand/Payoff Statement.  North Carolina law, General Statutes § 45.36.7(h) prohibits a lender from charging any fee for providing a borrower with a payoff statement.

66.     In the case of Bloom, that Payoff Statement Fee was $120 as demanded by "Washington Mutual" and WMB f/k/a WMBFA in an August 27, 2002 Demand/Payoff

Statement.  A HUD-1 Settlement Statement, dated September 9, 2002, confirms payment of the

$120 Payoff Statement Fee by Bloom and his wife to WMB f/k/a WMBFA.  Among other

violations, the imposition and collection of the $120 Payoff Statement Fee was an unlawful

TILA finance charge and prepayment penalty that was not disclosed to Bloom or his wife either

prior to the origination of their mortgage loan or after acquisition by WMB f/k/a WMBFA of

Bloom's loan and the commencement of servicing of Bloom's loan by WMB f/k/a WMBFA up

until the August 27, 2002 Demand/Payoff Statement sent by WMB f/k/a WMBFA to Bloom and

his wife.

     67.     After being informed by WMB f/k/a WMBFA in its Demand/Payoff Statement

that payment of the $120 Payoff Statement Fee was required to obtain a release of the lien on

their home, Bloom and his wife sent complaint letters to both WMB f/k/a WMBFA and the

Oregon Attorney General.  Those complaint letters demanded a refund of the $120 Payoff

Statement Fee, as it was contrary to Note and Deed of Trust pertaining to Bloom and his wife's

loan.  In response, WMB f/k/a WMBFA stated to Bloom and his wife in a September 10, 2002

letter that:  "Unfortunately, we are unable to refund this fee."  That letter also stated:  "Please be

advised that this is a mandatory fee, only assessed at the time of payoff."

     68.     The Payoff Statement Fees and Fax Fees, no matter how described by Defendants,

constitute undisclosed finance charges, prepayment penalties and unearned settlement fees levied

by Defendants on borrowers that pay off home loans, mortgage loans, co-op loans, home equity

loans or home equity lines of credit prior to their stated term or maturity.  Those fees and

penalties would not have been imposed on, or paid by, Plaintiffs and the members of the Classes

had they paid off their mortgages, home loans or lines of credit at maturity rather than at an earlier date.

69.    Defendants also charge and collect a "Recording Fee" for recording or filing the satisfaction of the mortgage originated and/or serviced by Defendants. In Cassese's case, that fee was $26.50.  New York law presently requires that a mortgage satisfaction be presented for recording or to the borrower within 30 days from the last payment of principle and interest owed on the mortgage.  Prior versions of the statute required recoding within 45 days of loan satisfaction.  In the case of Cassese, her mortgage was fully re-paid and satisfied on or about June 12, 2002.  However, satisfaction of Cassese's mortgage was not recorded until March 3, 2003.  Defendants charged and collected the Recording Fee from WMI Class and WMB Class members, such as Plaintiff Cassese, even though Defendants may not have even recorded the satisfaction of mortgage, and do not comply with the applicable laws for timely recording.

70.    "Washington Mutual" imposed and collected the Recording Fee from Cassese, even though the title insurance provider also imposed and collected a $65 recording fee from Cassese for recording the satisfaction of Cassese's mortgage.

71.    As demonstrated by the HUD-1 Uniform Settlement Statement pertaining to the settlement and satisfaction of Cassese's mortgage loan, on June 12, 2002, Cassese paid all monies, charges, fees and penalties demanded in the Washington Mutual Demand/Payoff Statement, including the $10 Fax or Payoff Statement Fee and $26.50 Recording Fee.

72.    That HUD-1 Settlement Statement pertaining to the repayment of Cassese's mortgage also demonstrates that Cassese paid the $65 recording fee to the title insurance

provider to record the satisfaction of her mortgage originated by WMB f/k/a WMBFA and serviced by one or more Defendants.

73.     "Washington Mutual" imposed and collected from Rush a Recording Fee in the amount of $20 to file or record a satisfaction of his mortgage.  New Jersey law requires that a mortgage satisfaction be recorded within 30 days from receipt of all fees which are required to be paid by the mortgagor.  In the case of Rush, his mortgage and all fees demanded by Defendants were fully re-paid and satisfied on or about October 24, 2001.  However, satisfaction of Rush's mortgage was not filed or recorded until February, 2002.   Defendants charge and collect, or charged and collected, the Recording Fee from Plaintiffs and the members of the Classes, such as Rush, even though Defendants may not have even recorded the satisfaction, and do not comply with the applicable laws for timely recording.

74.     Although it does not appear at this time that Defendants charged Schroer a Recording Fee, they filed his Certificate of Satisfaction in an untimely manner, more than 60 days after prepayment and full satisfaction of this loan on or about September 29, 2003, in violation of North Carolina law.  Washington Mutual claims to have sent the Certificate of Satisfaction to the Gilford County, North Carolina Register of Deeds on December 26, 2003, and that it was recorded on January 2, 2004.

75.     WMB f/k/a WMBFA did not disclose prior to the origination of Cassese's mortgage loan, including in standardized Truth in Lending Disclosure Statements, Good Faith Estimates, Servicing Disclosure Statements or Commitment Letters, the existence of the mandatory Payoff Statement Fee, Fax Fee and/or Recording Fee listed in the Demand/Payoff Statements provided to Cassese, and later collected by Defendants.

25

76.   WMB f/k/a WMBFA did not disclose prior to the origination of Rush's mortgage loan, including in standardized Truth in Lending Disclosure Statements, Good Faith Estimates, Servicing Disclosure Statements or Commitment Letters, the existence of the mandatory Payoff Statement Fee and/or Recording Fee listed in the Demand/Payoff Statements provided to Plaintiff Rush, and later collected by Defendants.

77.   Other consumers have complained of Defendants' deceptive and unlawful imposition and collection of fees, charges and penalties imposed by Defendants for prepayment of their mortgage loans, home loans or lines of credit, including about the Fax Fees and Payoff Statement Fees.  One consumer lodged a complaint on Complaints.com noting that Washington Mutual demanded a $60 "Payoff statement fee" in a "Washington Mutual Demand/Payoff Statement" dated August 20, 2003.   Another consumer lodged a complaint on Findlaw.com on July 8, 2002 stating that Washington Mutual imposed a $60 payment statement fee and a $10 fee for faxing the payoff statement.

78.   Other consumers have complained to their respective state Attorneys General or the Federal Trade Commission ("FTC") about Defendants' practices of imposing and collecting unlawful and undisclosed finance charges, settlement fees and prepayment penalties in the form of Defendants' Payoff Statement Fees and Fax Fees and about Defendants' untimely recording or mailing of loan satisfactions.  Some of those complaints have been provided to Plaintiffs' counsel following requests made pursuant to freedom of information laws.

79.   Those consumer complaints further demonstrate Defendants' unlawful and deceptive practices and corroborate Plaintiffs' allegations.   A sample of those complaints state the following:

26

(a)      An Oregon consumer stated in an April 25, 2003 complaint to WMB f/k/a

WMBFA, provided to the Oregon Attorney General:

I spoke to Mr. James Driver, a Supervisor in Customer Care Dept at 9:20 a.m. on
4/21/03 P.S.T.  I called to see why you charged me $60 for other fees?  He told
me it was for providing my loan payoff amount to Ameriti[t]le Escrow Company.
(1) I never signed any papers with you saying I would pay charges for that
service.

In response to a letter from WMB responding to this Oregon consumer's

complaint, the same Oregon consumer stated the following in a May 15, 2003

letter to WMB, provided to the Oregon Attorney General:

In your [WMB] letter you [WMB] stated "Our IVR automated phone system does
warn callers <u>there is an undisclosed fee associated with ordering payoff
statements</u>."  …  (3) Also on our statement, nothing is mentioned about a payoff
charge inquiry.  It just states "other fees".  I wonder how many people get these
statements and wonder what "Other Fees" mean, but do not take the time to find
out.  I would bet you make lots of money just by adding things to statements as
"Other Fees".  [Emphasis added].

(b)      A Florida consumer filed a complaint on May 4, 2004 with the Florida

Attorney General Fraud Hotline concerning "Washington Mutual" described by

the Florida Attorney General's office as follows:

[Consumer] is a senior citizen on a fixed income.  …  Caller said that she has also
requested by phone for a pay off amount as it is relatively low.  They sent her a
statement and charged her for this.

(c)      A Maryland consumer stated as follows in an April 1, 2002 complaint to

the Maryland Attorney General concerning WMHLI:

Briefly, they [Washington Mutual] have been harassing us with phone calls,
charging us late fees, ruining our credit and <u>charging what I feel is an exorbitant
[sic] fee of $60 just to tell another company what our pay off would be</u>.
[Emphasis added].

27

(d)     A Michigan consumer stated as follows in a March 6, 2003 complaint to

the Michigan Attorney General concerning WMB f/k/a WMBFA:

I remortgaged my property with Hearthside Mortgage in Grand Rapids, who sold
my mortgage to Washington Mutual.  I decided to refinance the property again at
MSU Federal Credit Union.  At the time I received my mortgage documentation I
was surprised a statement fee charged by Washington Mutual of $60 and a charge
to fax this statement to the credit union of $40.  I questioned the mortgage officer
who said the fax fee was among the highest she had ever seen.  The $60, while
high, had been seen before.  The credit union does not charge such a fee.  I called
the bank and was told they have every right to charge such a fee and somewhere
in that myriad of documentation I had agreed to the sale and subsequent changes
to conditions.  I feel the fee is usurious and onerous and that if a mortgage
company purchases a mortgage they should purchase the fees along with the
interest rate an[d] other terms.  Of course I would like to have my money, but
more I want to make others aware of these extra costs of refinancing a home.  The
government is making home ownership more accessible by maintaining a low
interest rate environment, some financial institutions are charging higher fees
because of the lower rates, fees the consumer is not informed about.

(e)     A Michigan consumer stated as follows in a February, 2003 complaint to

the Michigan Attorney General concerning "Washington Mutual":

I purchased a mortgage on my home from North Country Bank of Traverse City,
Michigan.  The mortgage was immediately sold to Washington Mutual.  I have
recently inquired about the amount required to pay off this mortgage and I was
told that I be charged $60 for this information.  I have read the entire mortgage
document and am unable to detect any language which would permit a service
company nor [sic] anyone else to charge a service fee to provide me with a payoff
amount for this mortgage.  The mortgage is standard Michigan – Single Family –
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (Bankers System, Inc., St.
Cloud, MN Form MD-1-MI 8/17/2000).  I have also read the accompanying Note
(date of this form is 8/19/2000 with the same Fannie Mae Uniform Instrument
designation as is on the mortgage document).

(f)     A Missouri consumer stated as follows in an October, 2004 FTC complaint:

I have closed out a home loan with this Washington Mutual bank almost a year
and a half ago Louan [redacted by FTC] I have paid this loan off it has a zero
balance.  Washington Mutual has not removed the lean [sic] on the land the house
was on.

28

(g)      A  Pennsylvania consumer complaint to the FTC was summarized by the

FTC in November, 2003 as follows:

On July 27th the consumer paid off the mortgage and the County court house records do not show this and the consumer does have the deed to his house at this time.  The consumer feels that he has given this company [*i.e.* Washington Mutual Home Loans] more than enough time.

(h) A California consumer complaint to the FTC was summarized by the FTC in

August, 2003 as follows:

Washington Mutual did not show and had nothing to show about a 1% cancellation fee that was charged to him because of early termination.  The fee was paid through the refinance.  The consumer was told that the company tells consumers about this fee through word of mouth but this did not occur either.

(i)  A Wisconsin consumer stated as follows in an August, 2003 FTC complaint:

We recently re-financed our home mortgage.  The pay-off of the old mortgage was to Wash. Mutual.  The fee for the pay-off statement sent to the title co. was $60.00  This was in addition to a recording fee of $10.00.  The $60.00 was for information that is available for free on their web site or in a tel. call to their cust. serv. dept.  But they charge $60.00 to fax it to the title company or to the borrower.  This is definitely an excessive and unfair charge and if [it] is not a violation of the lending laws, it should be.

(j)      An Ohio consumer complaint to the FTC in April, 2003 was summarized

by the FTC as follows:

The consumer writes that he had a mortgage through Washington Mutual.  The consumer notes Washington Mutual was supposed to send a deed of satisfaction so a lien could be lifted from his house, but they have failed to do so.

(k)       A Florida consumer complaint to the FTC in June, 2003 was summarized

by the FTC as follows:

The consumer wrote the following information in a letter that was sent to the FTC.  The consumer claims that Washington Mutual has failed to send the consumer's satisfaction of mortgage notice to the recorder's office.

(l)  A Florida consumer complaint to the FTC was summarized in July, 2003  by

the FTC as follows:

The consumer is reporting that her mortgage company Washington Mutual will not provide her statement of satisfaction.  The consumer reports that they have stated on numerous occasions that they have sent out the statement, but she talked to a representative [who] stated that it had not and would be sent the statement [sic].  The consumer reports that she still has not received the statement four months later.

(m)     An Ohio consumer stated as follows in a May, 2003 FTC complaint:

My home mortgage was sold several times and ended up with this company.  The loan was paid off in November, 2002 and I received a letter stating that it was paid in full.  However, six months later, the Lucas County Recorder's Office still has not receive a Satisfaction/Reconveyance/Release from Washington Mutual and the mor[t]gage is still listed on my property.  I have written and made numerous telephone calls to Washington Mutual.  All I get is a "customer service" person who doesn't seem to know much[,] and promises.

(n)     An Ohio consumer complaint to the FTC in October 2002 was

summarized by the FTC as follows:

Consumer is trying to refinance his house and went to a bank to get a full disclosure of what the fees would be.  They requested a pay off schedule from the current home lender [*i.e.* Washington Mutual], who charged the consumer $60 for this information.  The consumer agreed to pay refinancing charges to the new bank.  Consumer did not agree to pay for the payoff information.  The bank said that by giving a social security number this authorizes the bank to make the charge.  Consumer feels he should not have to pay the fee since this information was not included in the charges he was given by the new bank.  The consumer is able to get this information for free online.

(o)     A Texas consumer stated as follows in a September, 2002 FTC complaint:

I'm 78 – My condo is for sale – I called Wash. Mutual for a pay-off amount – A recording said there was a fee, but not how much – It's $120 – On a fixed income

I wouldn't have ordered the info had I known the amount – It is too much & unfair – I wasn't told so I could have made an informed decision.

(p)     A New Jersey consumer complaint to the FTC in July 2002 was

summarized by the FTC as follows:

The consumer called [Washington Mutual] requesting a mortgage pay off amount. The consumer had to use the automated system with a fee amount not disclosed, in getting the pay off amount.  When the consumer received the statement, the amount of the fee was $60.00.

(q)     An Illinois consumer complaint to the FTC in April 2002 was

summarized by the FTC as follows:

I have recently sold my home and requested a mortgage payoff letter from Washington Mutual.  With no indication that there would even BE a charge, I received a bill; $60.00 for the letter and a $10.00 fax fee.  I thought this amount was outrageous.  I immediately called my mortgage broker who works with over 100 lenders.  She said she had NEVER heard of a lender that charged this much; most charged between $10 and $15.  Additionally, my attorney said the he too had never had a client pay more than $20.00 for a mortgagae [sic] payoff letter.  When I called Washington Mutual to complain they said that this was their policy and there was no way around it.  Then I asked to speak to a supervisor who told me the same thing.

(r)  A Washington consumer stated as follows in an October, 2001 FTC complaint:

In April 2001 I noticed a $60.00 fee that was being ap[p]lied to our statements. When I called to inquire into the nature of these charge[s] we were told it was because a pay-off amount was ordered.  The absurdity of the 60.00 aside, I question why this 60.00 fee has been take out of our autodraft EVERY MONTH since April.  We were told that this was being charged to us because it was noted unpaid even though it has been paid through our autodraft.

80.     Defendants do not deny imposing and collecting Payoff Statement Fees.  In fact,

they admitted the practice on their website (www.wamuhomeloans.com/help/faq/homeloan.jsp),

stating:  "A payoff statement fee may be collected at the time your loan is paid off, if allowed by

the state in which your property is located."  New York, New Jersey, North Carolina and other

states do not permit such fees and such prepayment penalties are forbidden by the mortgage and note agreements prepared by Defendants as well as the rules and regulations promulgated by FNMA, GNMA, FHLMC and FHLB.

81.    Plaintiffs and the members of the Classes were financially injured as a direct and proximate result of Defendants' false, misleading, deceptive and unconscionable acts, practices and conduct (including their breach of mortgage and note agreements) described herein.

82.    To the extent that Plaintiffs and the members of the Classes are not entitled to recover all their damages from Defendants, Plaintiffs and the members of the Classes have been and will continue to be irreparably injured and have no adequate remedy at law for Defendants' violations of law complained of herein.

***WMI Directly Participated and Benefitted From the Unlawful Demand and Collection of the Dispute Fees, Finance Charges and Prepayment Penalties, and Controlled the Operations of its Banking Subsidiaries, including WMB f/k/a WMBFA, state-chartered WMB and WMHLI.***

83.    WMI's active role and extensive financial benefit in the residential lending and servicing of Plaintiffs and the members of the Classes' loans is discussed WMI's public financial statements:

> Our [WMI's] earnings are primarily driven by real estate secured lending and deposit taking activities which generate net interest income and by activities that generate noninterest income, including the sale and servicing of loans and providing fee-based services to our customers. Real estate secured loans and mortgage-backed securities generate more than 90% of interest income and this concentration is likely to continue as a result of our decision to exit certain non-core businesses, such as lending to mid- and large-sized companies.

WMI 2004 SEC Form 10-K.

> The Company's earnings are primarily driven by lending to consumers and small businesses and by deposit taking activities which generate net interest income, and by activities that generate noninterest income, including the sale and servicing of loans and the provision of fee-based services to its customers.

The Company currently has four operating segments for management reporting purposes: the Retail Banking Group, which operates a retail bank network of 2,225 stores in California, Florida, Texas, New York, Washington, Illinois, Oregon, New Jersey, Georgia, Arizona, Colorado, Nevada, Utah, Idaho and Connecticut; the Card Services Group, which operates a nationwide credit card lending business; the Commercial Group, which conducts a multi-family and commercial real estate lending business in selected markets; **and the Home Loans Group, which engages in nationwide single-family residential real estate lending, servicing and capital markets activities.** Financial information and descriptions of these operating segments are provided in the Management's Discussion and Analysis section of this Annual Report on Form 10-K.

WMI 2006 SEC Form 10-K (emphasis added).

84.    As admitted in WMI's SEC Form 10-K/A for the year ended December 31, 2002: "All of our banking subsidiaries are under the common control of Washington Mutual, Inc. and are insured by the FDIC."

85.    As admitted in WMI's SEC Form 10-K for the year ended December 31, 2003: "All of our banking subsidiaries are under the common control of Washington Mutual, Inc. and are insured by the FDIC."

86.    As admitted in WMI's SEC Form 10-K for the year ended December 31, 2004: "All of our banking subsidiaries are under the common control of Washington Mutual, Inc. and are insured by the FDIC."

87.    As admitted in WMI's SEC Form 10-K for the year ended December 31, 2005: "All of our banking subsidiaries are under the common control of Washington Mutual, Inc. and are insured by the FDIC."

88.     As admitted in WMI's SEC Form 10-K for the year ended December 31, 2006: "Both of the Company's [WMI's] banking subsidiaries are under the common control of Washington Mutual, Inc. and are insured by the FDIC."

89.     As admitted in WMI's SEC Form 10-K for the year ended December 31, 2007: "Both WMB and WMBfsb are under the common control of Washington Mutual, Inc. and are insured by the FDIC."

90.     A June 30, 2005 WMI press release stated that the President of WMI's "Home Loans Division" will "oversee all aspects of the company's home loans business."

91.     WMI reported the operating results of each of its banking subsidiaries, including WMB f/k/a WMBFA, state-chartered WBM and WMHLI, and including those WMI subsidiaries' collection of the Disputed Fees challenged in this action.

92.     WMI officers held controlling positions in WMI's residential lending and servicing subsidiaries.   Until he was terminated as Chairman in June 2008 and CEO in September 2008, Kerry Killinger was the Chairman and CEO of WMI, Chairman and CEO of WMB f/k/a WMBFA and the Chairman of WMBfsb; Until December 2007, Fay Chapman was the Senior Executive Vice President and Chief Legal Counsel for both WMI and WMB f/k/a WMBFA; Thomas Casey was an Executive Vice President of for both WMI and WMB f/k/a WMBFA; Steven Rotella was the President and Chief Operating Officer of WMI and the President of WMB f/k/a WMBFA; Craig Chapman was a member of the WMI Executive Committee and also the President of WMB f/k/a WMBFA; and David Schneider was a member the WMI Executive Committee while also serving as President of WMB f/k/a WMBFA's Home Loans group.

93.     A November 10, 2003 WMI press release "announced the promotion of Greg Sayegh to senior vice president, national retail lending."  "In his new role, Sayegh will be responsible for directing and managing Washington Mutual's entire retail mortgage network, which includes more than 2,500 loan consultants in nearly 400 home loan centers across the nation.  Over the years, Greg has been instrumental in the growth of our retail lending operations, said Tony Meola, Washington Mutual's executive vice president for home lending sales and distribution."

94.     A January 27, 2005 WMI press release stated that:  "Washington Mutual currently operates more than 2,400 retail banking, mortgage lending, commercial banking and financial services offices throughout the nation."

95.     A February 28, 2005 WMI press release announced that WMI promoted two executives.  "As president of Retail Banking Distribution, Michael Amato oversees nearly 2,000 financial centers in 14 states."  "As present of Banking Products and Operations, Ken Kido oversees all aspects of the company's consumer lending and deposit product management and operations."  Both executives were appointed to WMI's executive committee, "the company's [WMI's] strategic governing body …."  This same WMI press release announced the hiring of three new executives to WMI's "Home Loans" division.

96.     A June 30, 2005 WMI press release "announced that it has hired David C. Schneider to be president of its [WMI's] Home Loans Division.  Effective August 8, he will oversee all aspects of the company's home loans business, including its industry leading sales production team and $730 billion mortgage servicing portfolio, reporting to Washington Mutual President and Chief Operating Officer Steve Rotella. He will also become a member of

35

Washington Mutual's Executive Committee.  Schneider assumes the reins of the Home Loans

Division from [Stephen] Rotella who has served as acting head of the business since March."

97.     A manager of Defendants' residential loan research department, WMB Vice

President Norman Shaw, testified in this action that Defendants did not distinguish the servicing

activities performed by the various "Washington Mutual" entities:

A.      Well, again, we don't differentiate between different entities within the bank.
        And so if one of those entities had originated a loan or something, we would not
        look to that as a criteria or something.  We treat everything -- everything is the
        same.  They're all loans to us.

Q.      When you say entities within the bank, you mean the entities that bear the
        Washington Mutual name?

A.      Correct.  Yes.

Shaw Tr. at 49.

98.     WMI was sponsor of numerous benefit plans, ERISA-covered plans, and defined

benefit plans, including the WaMu Pension Plan and the WaMu Savings Plan, that covered and

permitted the participation of employees of WMB f/k/a WMBFA and WMI's other subsidiaries.

99.     In the wake of the recent financial crisis, the United States Senate Committee on

Homeland Security & Governmental Affairs, Permanent Subcommittee on Investigations held

hearings on the impact of certain practices on the fiscal stability of the United States.  One such

hearing -- convened on April 13, 2010 -- examined the role of high risk home loans, using the

Washington Mutual companies as an example.   Several executives holding positions

simultaneously at WMI and WMB testified about WMI's (and its subsidiaries') lending

practices.  These executives also submitted written testimony.  The testimony pertinent to this

motion included:

36

**James Vanasek – Chief Credit Officer and later Chief Risk Officer of "Washington Mutual" from September 1999 to December 2005**

- testified that he was "forced by our external auditor to reduce the loan loss reserve of $1.8 billion by $500 million or risk losing our audit certification"

Mr. Vanasek here is discussing how he was forced by WMI's outside accountants in preparation of WMI's certified financial statements accompanying its financial statements to the SEC;

- Received a September 8, 2008 document entitled "Home Loans – Risk Mitigation and Mortgage Fraud – 2008 Targeted Review" prepared by "Washington Mutual, Inc.", demonstrating WMI's participation in reviewing the loans of WMB for fraud risk.

**Randy Melby – General Auditor of "Washington Mutual"**

- testified concerning WaMu's consolidation of family residential mortgage lending lending operations in the fourth quarter of 2005 and described WaMu's internal audits of the "Home Loans Group" in 2005-2008.

**David Schneider – President of Home Loans at "Washington Mutual" (and a member of WMI's Executive Committee):**

- testified concerning "WaMu" and its strategies concerning the home loan business; using "WaMu" to describe WMI when testifying concerning the $140 billion of Mortgage Servicing Rights it sold in 2006.

100.    Other members of WMI's executive committee, including Kerry Killinger and Stephen Rotella, testified before the Senate about their oversight of WMB's loan operations.

101.    In Adversary Proceeding No. 09-50551, filed by JPMC against WMI in WMI's ongoing bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware, WMI filed an Answer and Counterclaim on September 11, 2009 wherein WMI stated and admitted that:

(a)     "In the years preceding the seizure, the WaMu corporate family encompassed dozens of companies that operated, primarily under the WAMU

brand, as a single, unified organization. Many of these companies conducted business under the WaMu Marks, as part of the larger Washington Mutual corporate family." *Id.*, ¶82 (emphasis supplied);

(b)      "Wamu.com was the primary website for WMI and its subsidiaries, and as such was the primary centralized focal point for customer interaction ...."; *Id.* at ¶86;

(c)      "It was WMI's policy and practice to register the WaMu Marks and the Secondary Marks with the United States Patent and Trademark Office in the name of WMI, the holding company. WMI subsidiaries operating under the WaMu Marks and/or using the Secondary Marks were permitted to use them for the products and services relevant to such subsidiary's business pursuant to an implied license from WMI for as long as the subsidiary remained part of the Washington Mutual corporate family." *Id.*, ¶84;

(d)      "Banking services and related services have been provided under some or all of the WaMu Marks since 1889." *Id.*, ¶82 (the second, misnumbered ¶82);

(e)      "WMI also owns registrations for at least 140 other trade marks and service marks, each in connection with various lines of business of the WaMu corporate family ...." *Id.*, ¶83;

(f)      "From December 2007 through April 2008, WMI made the [sic] Capital Contributions to WMB in the amount of $6.5 billion." *Id.*, Counterclaim, ¶13;

(g)      WMI and WMB f/k/a WMBFA established so-called "Special Purpose Entities" or "SPEs" which issued Trust Securities, the value of which was related

to mortgage interests. These instruments were valued at approximately $4 billion and were sold to qualified investors. *Id.*, ¶¶ 32-34;

(h)  WMI contended that its September 25, 2008 transfer of the Trust Securities to WMB f/k/a WMBFA was avoidable because "the transfer was made to an insider, WMB or J.P. Morgan Chase, as successor in interest to WMB, while WMI was insolvent and while WMB or J.P. Morgan Chase had reasonable cause to believe that WMI was insolvent" *Id.*, ¶ 48;

**The Failure and Seizure of Washington Mutual Bank, the Appointment of the FDIC as Receiver, the Sale of Washington Mutual Bank's Assets and Liabilities by the FDIC to JPMC, Plaintiffs' and the Classes' Claims to the FDIC / Receiver and the Bankruptcy Filing of WMI**

102.  On September 25, 2008, the OTS seized WMB f/k/a WMBFA and appointed the FDIC as a receiver.

103.  That same day, the FDIC sold WMB's f/k/a WMBFA's assets and subsidiaries to JPMC pursuant to a Purchase and Assumption Agreement.  JPMC purchased these assets for approximately $1.9 billion and agreed to assume liabilities and obligations of WMB f/k/a WMBFA and its subsidiaries.

104.  Among the assets it acquired on September 25, 2008, JPMC claims to have purchased all the outstanding stock in WMBfsb and to therefore be the successor-in-interest to WMBfsb.

105.  On October 24, 2008, the FDIC filed a Notice of Substitution of Party to substitute itself for WMB f/k/a WMBFA as a defendant in this action.  The FDIC has also represented that it is the appropriate substituted party in this action for defendants WMHLI and

state-chartered WMB, both of which were previously subsumed, integrated or merged into WMB

f/k/a WMBFA.

106.   Following its appointment as the receiver for WMB f/k/a WMBFA, the FDIC has

requested claims against the assets for WMB f/k/a WMBFA held in receivership by the FDIC.

On December 30, 2008 and in March 2009, after this Court certified the WMB Class, Plaintiffs

and the WMB Class submitted timely claims to the FDIC / Receiver, expressly reserving all

rights to maintain and prosecute this class action.   In their December 30, 2008 claim, Plaintiffs

and Class Counsel advised the FDIC / Receiver, among other things, as follows:

> A true copy of the decision and order, dated December 29, 2008, certifying the
> nationwide class of present and former residential loan borrowers of Washington
> Mutual Bank is attached hereto as Exhibit 2.   …
>
> It is our current belief that the FDIC has not provided notices or claim forms to
> absent members of class certified by the court in the above-referenced action.
> Therefore, as court-appointed class counsel, we hereby preserve and submit to the
> FDIC as Receiver of Washington Mutual Bank the claims of all members of the
> class certified in the above-referenced action as described and alleged in the
> Second Amended Class Action Complaint (Exhibit 1 hereto).  Class counsel also
> hereby expressly reserves, and expressly does not waive, any and all claims and
> remedies sought by plaintiffs and the certified class in the above-referenced and
> ongoing litigation.

107.   On September 26, 2008 WMI filed a voluntary petition for bankruptcy protection

in the United States Bankruptcy Court for the District of Delaware.

108.   Plaintiffs, on behalf of themselves and the Classes, moved in the Delaware

Bankruptcy Court to lift the automatic stay to continue this action in this Court against WMI.  On

August 24, 2009, the Delaware Bankruptcy Court granted Plaintiffs' motion to lift the automatic

bankruptcy stay.  The Delaware Bankruptcy Court's order was entered on September 10, 2009.

109.    Multiple lawsuits and adversarial proceedings between and among WMI, the

FDIC, JPMC and certain third-parties have been filed concerning the lawfulness of the seizure of

WMB f/k/a WMBFA, the actions of the FDIC and the sale of WMB's f/k/a WMBFA's assets to

JPMC.

## CLASS ACTION ALLEGATIONS

110.    Plaintiffs moved for certification of the following class in this action:

> All consumers or borrowers in the United States and its territories who had a mortgage,
> deed of trust, home loan, co-operative loan, home equity loan or line of credit secured by
> a residence, which loan was serviced by any of the Defendants and who paid prohibited
> fees, charges and/or penalties (often but not always termed "Fax Fees," "Payoff
> Statement Fees," "Recording Fees" or "UCC-3 Fees" by Defendants in Payoff
> Statements) in connection with requests for payoff statements or payoff amounts or the
> prepayment, repayment, discharge, satisfaction or settlement of loans secured by a
> residence.

Excluded from the Classes were Defendants, their parents, subsidiaries, officers, directors,

employees, partners and co-venturers.

111.    On December 29, 2008, the Court certified the following class (the "WMB

Class") of past and present borrowers pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal

Rules of Civil Procedure as to WMB, f/k/a WMBFA:

> All consumers or borrowers in the United States and its territories who had a
> mortgage, deed of trust, home loan, cooperative loan, home equity loan or line of
> credit secured by a residence, which loan was serviced by Washington Mutual
> Bank, formerly known as Washington Mutual Bank, FA and who paid or will be
> demanded to pay prohibited fees, charges and/or penalties (often but not always
> termed "Fax Fees," "Payoff Statement Fees," "Recording Fees," or "UCC-3 Fees"
> by Washington Mutual Bank, formerly known as Washington Mutual Bank,  FA
> in Payoff Statements) in connection with requests for payoff statements or payoff
> amounts or the prepayment, repayment, discharge, satisfaction or settlement of
> loans secured by a residence.

Docket No. 215.  In the Court's December 29, 2008 Memorandum of Decision and Order, the

Court certified Plaintiffs, save Plaintiff Bloom who was not then a named party to this action, as the representatives for the WMB Class and Plaintiffs' counsel as counsel for the WMB Class.

112.    In a May 13, 2010 Memorandum of Decision and Order, over the objection and opposition of Plaintiffs and the certified WMB Class, made by and through Class Counsel, the Court granted a motion by the FDIC to decertify the WMB Class.  Docket No. 302.  On May 27, 2010, Plaintiffs, by and through Class Counsel, filed a petition pursuant to Fed. R. Civ. P. 23(f) with the Second Circuit Court of Appeals seeking permission for an immediate appeal of that portion of the Court's May 13, 2010 Memorandum of Decision and Order that granted the FDIC's motion to decertify the WMB Class.  On October 5, 2010, the Second Circuit Court of Appeals denied Plaintiffs' petition.  Plaintiffs' arguments concerning that portion of the Court's May 13, 2010 Memorandum of Decision and Order that granted the FDIC's motion to decertify the WMB Class are preserved for appeal.

113.    On September 30, 2009, the Court certified the following class (the "WMI Class" or the "Class") of past and present borrowers pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure as to WMI:

> All consumers or borrowers in the United States and its territories who had a mortgage, deed of trust, home loan, cooperative loan, home equity loan or line of credit secured by a residence, which loan was serviced by Washington Mutual Bank, formerly known as Washington Mutual Bank, FA and who paid or will be demanded to pay prohibited fees, charges and/or penalties (often but not always termed "Fax Fees," "Payoff Statement Fees," "Recording Fees," or "UCC-3 Fees" by Washington Mutual Bank, formerly known as Washington Mutual Bank,  FA in Payoff Statements) in connection with requests for payoff statements or payoff amounts or the prepayment, repayment, discharge, satisfaction or settlement of loans secured by a residence.

Docket No. 257.  In the Court's September 30, 2009 Memorandum of Decision and Order, the

Court certified Plaintiffs, save Plaintiff Bloom who was not then a named party to this action, as the representatives for the WMI Class and Plaintiffs' counsel as counsel for the WMB Class.

114.    In a May 13, 2010 Memorandum of Decision and Order, the Court denied a motion by WMI to decertify the WMI Class.   Docket No. 302.   WMI did not file a timely petition pursuant to Fed. R. Civ. P. 23(f) to seek an immediate appeal of the Court's decision.

115.    In an October 18, 2010 Memorandum of Decision and Order, the Court denied a renewed, and improper and untimely, motion by WMI to decertify the WMI Class.   Docket No. 329.

116.    This action is brought as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, sub-sections 23(a) and 23(b)(2) and/or (b)(3).   The Class satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

117.    The members of the Classes are so numerous that joinder of all class members is impracticable.   While the exact number of class members can be determined only by appropriate discovery, Plaintiffs believe that members of the Classes number at least in the hundreds of thousands of persons, in New York, New Jersey, North Carolina, Oregon and throughout the United States.

118.    Because of the geographic dispersion of the members of the Classes, there is judicial economy arising from the avoidance of a multiplicity of actions in trying this matter as a class action.

119.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs have no interests that are adverse or antagonistic to those members of the Classes.

Plaintiffs' interests are to obtain relief for themselves and the Classes for the harm arising out of the violations of law set forth herein.

120.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in complex and consumer class action litigation.

121.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by each member of the Classes may be relatively small, the expense and burden of individual litigation make it virtually impossible for Plaintiffs and members of the Classes to individually seek redress for the wrongful conduct alleged.

122.    In addition, Defendants have acted and refused to act, as alleged herein, on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief and/or corresponding with respect to the Classes as a whole.

123.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of each Class.  Among the questions of law and fact common to the WMI Class and WMB Class are:

(a)    whether Defendants violated TILA;

(b)    whether Defendants violated RESPA;

(c)    whether Defendants violated New York Real Property Law §274-a and/or similar laws of other states;

(d)    whether Defendants violated New York Real Property Actions and Proceedings Law §1921 and/or similar laws of other states;

44

(e)     whether Defendants violated GBL §349 and/or the similar consumer practice statutes of other states;

(f)     whether Defendants' acts and practices were false, misleading and/or deceptive;

(g)     whether Defendants breached their contractual obligations to Plaintiffs and the WMI Class and WMB Class;

(h)     whether Defendants acted willfully, intentionally, knowingly and/or recklessly in failing to abide by the terms of their agreements with Plaintiffs and the WMI Class and WMB Class;

(i)     the proper measure of damages to be paid to Plaintiffs and the WMI Class and WMB Class;

(j)     whether Plaintiffs and the WMI Class and WMB Class are entitled to injunctive or other equitable relief to remedy Defendants' past and continuing violations of law alleged herein; and

(k)     whether Defendants have been unjustly enriched by their inequitable and unlawful conduct, and if so, whether Defendants should be forced to disgorge inequitably obtained revenues or provide restitution.

124.    The WMI Class and WMB Class are readily definable, and prosecution of this action as a class action will reduce the possibility of repetitious litigation.

125.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## FRAUDLENT CONCEALMENT AND EQUITABLE TOLLING

126.   Defendants have engaged in false, deceptive, misleading and unconscionable efforts to conceal the true nature of their unlawful conduct from Plaintiffs and the WMI Class and WMB Class.  Defendants have intended to and have in fact accomplished their concealment through misrepresentations and omissions, as described herein.

127.   Included among that deception was Defendants' practice of describing the fees listed in their Payoff Statements in a manner that should not have reasonably alerted WMI Class and WMB Class members that Defendants are imposing prepayment penalties, undisclosed finance charges, unearned settlement fees or fees prohibited by WMI Class and WMB Class members' Mortgage, Deed of Trust and/or Note agreements, such as imposing Payoff Statement Fees and Fax Fees but describing those fees as "Unpaid Late Charges and/or other fees" or by other inaccurate descriptions.

128.   Also included among Defendants' acts to conceal their unlawful conduct, Defendants, and in particular WMB f/k/a WMBFA, did not advise Plaintiffs for whom they demanded and collected "Recording Fees" that they would not record the satisfactions or that they would record the satisfactions after the time mandated by law to do so.

129.   Due to Defendants' fraudulent concealment and because Defendants represent or represented that the unlawful fees are legitimately charged and collected, Plaintiffs learned of the existence of her claims against Defendants shortly prior to becoming parties in this action or seeking to become parties in this action.  For the same reasons, many WMI Class and WMB Class members are likely to be reasonably unaware of Defendants' unlawful acts and the claim alleged in this action.

130.    Plaintiffs' and the WMI Class and WMB Class' lack of knowledge as to their claims against Defendants is and was not due to any fault or lack of diligence on their part, but rather due entirely or substantially to the acts of Defendants designed to conceal and hide the true nature of their unlawful and inequitable conduct.

## COUNT I

### (Violations of TILA)

131.    Plaintiffs repeat and reallege paragraphs 1 through 130 as though set forth herein.

132.    Plaintiff Bloom and each WMI Class and WMB Class member who paid undisclosed finance charges and/or prepayment penalties in excess of $100 are a "person" as that term is defined in 15 U.S.C. §1602(d) and a "consumer" as that term is defined in 15 U.S.C. §1602(h).

133.    Defendants are each "creditors" as that term is defined in 15 U.S.C. §1602(f).

134.    The mortgage and home loans originated or purchased by Defendants that were provided to Plaintiffs and the WMI Class and WMB Class are consumer credit transactions, and also "residential mortgage transactions" as that term is defined in 15 U.S.C. §1602(w) and applicable regulations promulgated by the Federal Reserve Board.

135.    The term "finance charge" is defined, in pertinent part, in 15 U.S.C. §1605(a) as "the sum of all charges, payable directly or indirectly by the persons to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit."

136.    None of the fees wrongfully charged and collected by Defendants are *bona fide* or reasonable, such that they may be excluded from the accurate disclosure of the finance charge

imposed by Defendants on Plaintiffs and members of the WMI Class and WMB Class who paid undisclosed finance charges and/or prepayment penalties in excess of $100.   In addition, Defendants imposed these fees in amounts that are in excess of the reasonable value of services provided.

137.   15 U.S.C. §§ 1632, 1637, 1637a, 1638, 1639, 1639a – 1639j and applicable regulations, require *inter alia* that creditors and servicers accurately, truthfully, completely, clearly and conspicuously disclose all finance charges, prepayment penalties and/or refinancing penalties to consumers in all consumer credit and residential mortgage and home loan transactions.

138.   As alleged herein, Defendants did not accurately, truthfully, completely, clearly and conspicuously disclose the amount of all finance charges, prepayment penalties and/or refinancing penalties in their consumer credit transactions and residential mortgage and home loan transactions with Plaintiffs and the WMI Class and WMB Class, including disclosures made by Defendants in loans, notes and mortgages with Plaintiffs and the WMI Class and WMB Class, in violation of 15 U.S.C. §§ 1632, 1637, 1637a, 1638, 1639 and applicable regulations.

139.   Defendants' acts, practices and conduct constitute *per se* violations of TILA. Even if not *per se* violations, Defendants' acts, practices and conduct violate TILA.

140.   Plaintiff Bloom and each WMI Class and WMB Class member who paid undisclosed finance charges and/or prepayment penalties in excess of $100 have been injured as a result of Defendants' violations of 15 U.S.C. §§ 1632, 1637, 1637a, 1638, 1639 and applicable regulations.   Plaintiff Bloom, for example, was charged an undisclosed finance charge and prepayment penalty, described by WMB f/k/a WMBFA in its Demand / Payoff Statement as a

$120 Payoff Statement Fee, which fee was not disclosed in the Federal Truth In Lending Disclosure Statement provided to Mr. Bloom and his wife and which was not disclosed to Plaintiff Bloom and his wife after WMB f/k/a WMBFA acquired Bloom's mortgage loan.

141.    Plaintiff Bloom and each WMI Class and WMB Class member who paid undisclosed finance charges and/or prepayment penalties in excess of $100 are entitled to pursue an action and a class action against Defendants pursuant to 15 U.S.C. §1640 to redress Defendants' violations of 15 U.S.C. §§ 1632, 1637, 1637a, 1638 1639 and applicable regulations.

## COUNT II

### (Violations of RESPA)

142.    Plaintiffs repeat and reallege paragraphs 1 through 130 as though set forth herein.

143.    Plaintiffs and each WMI Class and WMB Class member are a "person" as that term is defined in 12 U.S.C. §2602(5).

144.    The mortgage and home loans originated or purchased by Defendants and provided to Plaintiff and the WMI Class and WMB Class are "federally related mortgage loans" as that term is defined in 12 U.S.C. §2602(1).

145.    Defendants provided "settlement services" to Plaintiffs and the WMI Class and WMB Class, as that term is defined in 12 U.S.C. §2602(3) and applicable regulations.

146.    12 U.S.C. §2607(b) of RESPA states, in pertinent part, that: "no person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a

federally related mortgage loan other than for services actually performed."   24 C.F.R. §3500.14(c) construes 12 U.S.C. §2607(b) to also prohibit the charging of "unearned fee[s]."

147.   12 U.S.C. §2610, and applicable regulations, prohibits a lender or servicer from imposing any fee or charge "for or on account of the preparation and submission by such lender or servicer of the statement or statements required (in connection with such loan) by sections 2603 and 2609(c) of this title or by the Truth in Lending Act (15 U.S.C. 1601 *et seq.*)."

148.   As alleged herein, Defendants imposed fees, charges and penalties on Plaintiffs and the WMI Class and WMB Class for unearned settlement services and settlement services not provided, which Defendants' loan contracts stated would not be charged in connection with the prepayment and satisfaction of federally related mortgage loans and which are prohibited by RESPA and other federal laws and regulations.  In addition, the Payoff Statement Fees, Fax Fees and other fees, charges and penalties imposed by Defendants for prepayment of mortgage and home loans were in excess of the reasonable value of services provided.

149.   Defendants also violated RESPA by collecting "unearned fees" and/or fees not for "services actually performed" related to settlement, satisfaction and/or discharge of Plaintiffs' and WMI Class and WMB Class members' home loans.  Included among those unearned fees are fees imposed, collected and retained by Defendants that were prohibited by federal and/or state laws and/or fees that were collected by Defendants that were duplicative of fees imposed and collected by other persons for performing the same or similar settlement services and/or fees for services performed by persons other than Defendants.  For example, Defendants demand and collect unearned "Recording Fees" for recording loan satisfactions when in fact Defendants did not provide those services.

50

150.     Defendants' acts, practices and conduct constitute *per se* violations of RESPA. Even if not *per se* violations, Defendants' acts, practices and conduct violate RESPA.

151.     Plaintiffs and the WMI Class and WMB Class have been injured as a result of Defendants' violations of 12 U.S.C. §§ 2607 and 2610.

152.     Plaintiffs and the WMI Class and WMB Class are entitled to pursue an action and a class action against Defendants pursuant to 12 U.S.C. §§ 2607(d) and 2610 to redress Defendants' violations of RESPA.

## **COUNT III**

**(Violations of New York Real Property Law §274-a (and the similar laws of other jurisdictions, including, but not limited to, New Jersey Statutes Annotated §§ 46:10B-2 and 46:10B-25(f) and North Carolina General Statutes §45-36.7(h))**

153.     Plaintiffs repeat and reallege paragraphs 1 through 130 as though set forth herein.

154.     New York Real Property Law §274-a requires that Defendants, as the owners or servicers of Plaintiff Cassese's and other WMI Class and WMB Class members' whose home loans are or were secured by collateral located in New York, provide any mortgagor or their agent with mortgage-related documents concerning the amount necessary to pay off and satisfy a mortgage and/or home loan, upon request by any mortgagor or their agent.

155.     New York Real Property Law §274-a does not permit Defendants, as the owner or servicer of Plaintiff Cassese's and other WMI Class and WMB Class members' whose home loans are or were secured by collateral located in New York, to charge any fee for providing mortgage-related documents concerning the amount necessary to pay off and satisfy a mortgage and/or home loan owned or serviced by Defendants.

51

156.    Plaintiffs and other WMI Class and WMB Class members had mortgage and home loans originated and serviced by Defendants.

157.    Plaintiffs or their agents requested that Defendants provide them with mortgage-related documents concerning the amount necessary to payoff and satisfy a mortgage loan owned and/or serviced by Defendants.

158.    Defendants demanded, imposed and collected fees, charges and penalties from Plaintiffs Cassese, Rush, Schroer and Bloom and other WMI Class and WMB Class members for providing them Payoff Statements.  These fees, in Plaintiffs' cases, were collected by WMB f/k/a WMBFA or its affiliates and subsidiaries and were shared with and inured to the benefit of WMI.

159.    Defendants' imposition and collection of fees for providing payoff statements to Plaintiff Cassese and the other WMI Class and WMB Class members whose home loans are or were secured by collateral located in New York violate New York Real Property Law §274-a, and caused injury to Plaintiff Cassese and those WMI Class and WMB Class members.

160.    Plaintiff Cassese and other WMI Class and WMB Class members whose home loans are or were secured by collateral located in New York are entitled to pursue claims against Defendants pursuant to New York Real Property Law §274-a to redress Defendants' violations of that statute.

161.    Defendants' practices described in this Count have also violated the statutes in states other than New York, including but not limited to N.J.S.A. §§ 46:10B-2 and 46:10B-25(f) and North Carolina General Statutes §45-36.7(h), causing injury and permitting redress by

Plaintiffs Rush and Schroer and those WMI Class and WMB Class members residing outside of New York.

162.    The application of New York Real Property Law §274-a, and similar laws in other states, in this action, is consistent with OTS regulations and will only incidentally affect (or will not affect in any meaningful manner) the lending operations of any Defendant that is or was a federal savings association.

## COUNT IV

**(Violations of New York Real Property Actions & Proceedings Law § 1921 (and the similar laws of other jurisdictions, including, but not limited to, New Jersey Revised Statutes ("N.J.R.S.") §§ 46:18-5.1, 46:18-11.2, 46:18-11.3 and North Carolina General Statutes § 45-36.3 and Oregon Statutes §§ 86.140 and 86.720)**

163.    Plaintiffs repeat and reallege paragraphs 1 through 130 as though set forth herein.

164.    New York Real Property Actions and Proceedings Law §1921 requires that after the full repayment of principle, interest and other amounts owed on a mortgage loan, "a mortgagee of real property situate[d] in this state, unless otherwise requested in writing by the mortgagor or the assignee of such mortgage, must execute and acknowledge before a proper officer, in like manner as to entitle a conveyance to be recorded, a satisfaction of mortgage, and thereupon within thirty days, arrange to have the satisfaction of mortgage: (a) presented for recording to the recording officer of the county where the mortgage is recorded, or (b) if so requested by the mortgagor or the mortgagor's designee, to the mortgagor or the mortgagor's designee."

165.    Defendants charged, collected and did not refund a "Recording Fee" from Plaintiffs Cassese and Rush, and other WMI Class and WMB Class members, even though

Defendants failed to timely record or file the satisfactions of mortgage as required by New York Real Property Actions and Proceedings Law § 1921 and the similar laws of other states, including but not limited to New Jersey Revised Statutes ("N.J.R.S.") §§ 46:18-5.1, 46:18-11.2, 46:18-11.3 and North Carolina General Statutes § 45-36.3 and Oregon Statutes §§ 86.140 and 86.720.

166.    Plaintiff Cassese and other WMI Class and WMB Class members whose home loans are or were secured by collateral located in New York are entitled to the statutory damages imposed for violations of New York Real Property Actions and Proceedings Law § 1921, and were damaged in an amount at least equal to the amount of Recording Fees collected by Defendants.

167.    Plaintiff Cassese and other WMI Class and WMB Class members whose home loans are or were secured by collateral located in New York are entitled to pursue claims against Defendants pursuant to New York Real Property Actions and Proceedings Law §1921 to redress Defendants violations of that statute.

168.    Defendants' untimely recording of the satisfaction of Plaintiff Rush's, Plaintiff Schroer's and other WMI Class and WMB Class members' mortgages violated statutes in states other than New York, causing injury and permitting statutory damages and redress by WMI Class and WMB Class members residing outside of New York.

169.    The application of New York Real Property Actions & Proceedings Law § 1921, and similar laws in other states, in this action, is consistent with OTS regulations and will only incidentally affect (or will not affect in any meaningful manner) the lending operations of any Defendant that is or was a federal savings association.

54

## COUNT V

### (Violations of New York GBL §349)

170.    Plaintiffs repeat and reallege paragraphs 1 through 130 as though set forth herein.

171.    Plaintiffs and the WMI Class and WMB Class are "persons" within the meaning of GBL § 349(h).

172.    GBL § 349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

173.    As alleged herein, Defendants engaged in deceptive acts and practices in the form of misrepresentations and omissions during the conduct of business in and from New York in violation of GBL § 349(a).

174.    Defendants knew or should have known that their acts, practices, statements, correspondence, invoices and representations, as discussed above, were false and likely to deceive and mislead Plaintiffs and the WMI Class and WMB Class.

175.    Plaintiffs and the WMI Class and WMB Class have been injured as a result of Defendants' violations of GBL § 349(a).

176.    Defendants' deceptive and misleading acts and practices have directly, foreseeably, and proximately caused damages and injury to Plaintiffs and the other members of the WMI Class and WMB Class.

177.    Plaintiffs are entitled to pursue claims against Defendants pursuant to GBL § 349(h) to redress Defendants' violations of GBL § 349(a).

178.    The application of GBL § 349, in this action, is consistent with OTS regulations and will only incidentally affect (or will not affect in any meaningful manner) the lending operations of any Defendant that is or was a federal savings association.

## COUNT VI

**(Violations of the Consumer Protection Laws of States Other Than New York)**

179.    Plaintiffs repeat and reallege paragraphs 1 through 130 whose home loans are or were secured by collateral located in New York as though set forth herein.

180.    In the alternative that the New York GBL §349 does not provide redress to all Plaintiffs' and all WMI Class and WMB Class members' claims against Defendants, the following additional consumer protection statutes provide a basis for redress to Plaintiffs and the WMI Class and WMB Class based on Defendants' false, deceptive, misleading, unfair and unconscionable acts, practices and conduct:

(a)    The Alaska Unfair Trade Practices and Consumer Protection Act, Alaska State. §§ 45.50.471 *et seq*.;

(b)    The Arizona Consumer Fraud Act, Ariz. Rev. Stat. Ann. §§ 44-1521, et seq.;

(c)    The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101, *et seq*.;

(d)    The California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*. and/or the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.;

(e)    The Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101, *et seq*.;

(f)    The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq*.;

(g)     The Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, §§ 2511 et seq. and/or the Delaware Uniform Deceptive Trade Practices Act, Del. Code Ann. tit. 6, § 2531, *et seq.*;

(h)     District of Columbia Code Ann. § 28-3901;

(i)     The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.*;

(j)     The Georgia Uniform Deceptive Trade Practices Act, Ga. Code Ann. §§ 10-1-370, *et seq.*;

(k)     The Guam Deceptive Trade Practices – Consumer Protection Act, Guam Code Ann. tit. 5, Ch. 32;

(l)     The Hawaii Uniform Deceptive Trade Practices Act, Haw. Rev. Stat. §§ 481A-1, *et seq.* and/or Hawaii Rev. Stat. §§ 480-1, *et seq.*;

(m)     The Idaho Consumer Protection Act, Idaho Code §§ 48-601, *et seq.*;

(n)     The Illinois Consumer Fraud and Deceptive Business Practices Act, Ill. Comp. Stat. Ann. §§ 505/1 *et seq.* and/or the Illinois Uniform Deceptive Trade Practices Act, Ill. Comp. Stat. Ann. §§ 510/1 *et seq.*;

(o)     The Indiana Deceptive Consumer Sales Act, Ind. Code Ann. §§ 24-5-0.5-1, *et seq.*;

(p)     The Kansas Consumer Protection Act, Kan. Stat. Ann. §§ 50-623, *et seq*;

(q)     The Kentucky Consumer Protection Act, Ky. Rev. Stat. §§ 367.110, *et seq*;

(r)      The Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5, §§ 205A, *et seq.* and/or the Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. tit. 10, §§ 1211, *et seq.*;

(s)      The Maryland Consumer Protection Act, Md. Com. Law. Code Ann. §§ 13-101, *et seq.*;

(t)      The Massachusetts Regulation of Business Practice and Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A;

(u)      The Michigan Consumer Protection Act, Mich. Comp. Laws Ann §§ 445-901, *et seq.*;

(v)      The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. Ann. §§ 325D.43, *et seq.* and/or The Minnesota Prevention of Consumer Fraud Act, Minn. Stat. Ann. §§ 325F.68, *et seq.* and/or Minnesota Stat. Ann. § 8.31;

(w)      The Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.*;

(x)      The Nebraska Consumer Protect Act, Neb. Rev. Stat. §§ 59-1601, *et seq.* and/or the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. §§ 87-301, *et seq.*;

(y)      The Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903 *et seq.* and/or Nevada Rev. Stat. § 41.600;

(z)      The New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann., §§ 358-A:1, *et seq.*;

(aa)      The New Jersey Consumer Fraud Act, N.J.R.S. §§ 56:8-1, *et seq.*;

(bb)      The New Mexico Unfair Practices Act, N.M. Stat. Ann., §§ 57-12-1, *et seq.*;

(cc)      North Carolina Gen. Stat. §§ 75-1.1, *et seq.*;

(dd)     North Dakota Gen. Stat. §§ 51-15-01, *et seq.*;

(ee)     The Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. §§ 1345.01, *et seq.* and/or the Ohio Deceptive Trade Practices Act, Ohio Rev. Code. Ann. §§ 4165.01 *et seq.*;

(ff)     The Oklahoma Consumer Protection Act, Okla. Stat. Ann. tit. 15, §§ 751, *et seq.* and/or the Oklahoma Deceptive Trade Practices Act, Okla. Stat. Ann. tit. 78, §§ 51 *et seq.*;

(gg)     The Oregon Unlawful Trade Practices Law, Or. Rev. Stat., §§ 646-605 *et seq.*;

(hh)     The Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. tit. 73, §§ 201-1, *et seq.*;

(ii)     The Rhode Island Unfair Trade Practices and Consumer Protection Act, R.I. Gen. Law §§ 6-13.1-1, *et seq.*;

(jj)     The South Dakota Deceptive Trade Practices and Consumer Protection Act, S.D. Codified Laws Ann. §§ 37-24-1, *et seq.*;

(kk)     The Texas Deceptive Trade Practices – Consumer Protection Act, Tex. Bus. & Com. Code Ann. §§ 17.41, *et seq.*;

(ll)     The Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*;

(mm)    The Virgin Islands Consumer Protections Law, V.I. Code Ann. tit. 12, §§ 101, *et seq.*;

(nn)     The Washington Consumer Protection Act, Wash. Rev. Code Ann. §§ 19.86.010, *et seq.*;

(oo)     West Virginia Code §§ 46A-6-101, *et seq.*;

(pp)     Wisconsin Stat. Ann. § 100.18; and

(qq)     The Wyoming Consumer Protection Act, Wyo. Stat. § 40-12-101, *et seq*.

181.     The application of the consumer protections statutes listed in this action, included those listed in this Court, are consistent with OTS regulations and will only incidentally affect (or will not affect in any meaningful manner) the lending operations of any Defendant that is or was a federal savings association.

## COUNT VII

### (Breach of Contract)

182.     Plaintiffs repeat and reallege paragraphs 1 through 130 as though set forth herein.

183.     Plaintiffs and the other members of the WMI Class and WMB Class accepted Defendants' or other lenders' offer to borrow monies through Mortgage, Deeds of Trust and/or Note agreements upon the terms stated in those contracts prepared by Defendants or other lenders.

184.     In these contracts, Defendants or other lenders represented and agreed that Plaintiffs and the WMI Class and WMB Class would not be charged prepayment penalties or fees, but in fact did impose and collect prepayment penalties and fees from Plaintiffs and the WMI Class and WMB Class.

185.     In particular, Paragraph 5 of the Fixed/Adjustable Rate Note prepared by Defendants and provided to Plaintiff Cassese, entitled "BORROWER'S RIGHT TO PREPAY," states that Plaintiff Cassese "may make a full prepayment or partial prepayments without paying any prepayment charge."   Substantially similar language appears in the Notes provided to Plaintiffs Rush, Schroer and Bloom and WMI Class and WMB Class members.

186.    In addition, the Mortgage and/or Deed of Trust Agreements prepared by Defendants or other lenders and provided to Plaintiffs and WMI Class and WMB Class members challenged in this action.  For example, the Mortgage agreement prepared by Defendants and provided to Plaintiff Cassese, Paragraph 22, permits the imposition of fees related to releasing of the security instrument "only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law." ."  Substantially similar language appears in the Mortgages and Deeds of Trust provided to Plaintiffs Rush, Schroer and Bloom and WMI Class and WMB Class members.

187.    Moreover, OTS regulation 12 C.F.R. §560.34 does not permit any federal savings association to charge a fee for any prepayment of a loan unless permitted by the loan contract. Here, Defendants' loan contracts state that Defendants will not charge any prepayment penalties.

188.    By reason of Defendants' breaches, Plaintiffs and the WMI Class and WMB Class suffered financial injuries.

189.    The application of contract law in this action, and in particular those contracts prepared entirely by Defendants, is consistent with OTS regulations and will only incidentally affect (or will not affect in any meaningful manner) the lending operations of any Defendant that is or was a federal savings association.

## COUNT VIII

### (Common Law Unjust Enrichment)

190.   Plaintiffs repeat and reallege paragraphs 1 through 130 as though set forth herein.

191.   As alleged herein, Defendants have unjustly benefited from their unlawful and inequitable acts resulting in the payment of money by Plaintiffs and the WMI Class and WMB Class members.

192.   Defendants have derived monies, profits and revenues resulting from their false, misleading, deceptive, unfair and inequitable conduct.

193.   It would be inequitable for Defendants to be permitted to retain any of the proceeds derived as a result of their unlawful conduct.

194.   Defendants should be compelled to provide restitution to the Plaintiffs and the WMI Class and WMB Class members and/or to disgorge into a common fund or constructive trust for the benefit of Plaintiffs and the WMI Class and WMB Class, all proceeds received by them from any unlawful or inequitable act described in this Complaint which has inured to the unjust enrichment of Defendants.

195.   Defendants should also be enjoined from continuing to engage in any unlawful or inequitable act alleged in this Complaint.

196.   The application of common law unjust enrichment in this action is consistent with OTS regulations and will only incidentally affect (or will not affect in any meaningful manner) the lending operations of any Defendant that is or was a federal savings association.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Classes pray for judgment against Defendants, jointly and severally, as follows:

(1)     Certifying the WMI Class and WMB Class pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as the representatives for the WMI Class and WMB Class and designating their counsel as counsel for the WMI Class and WMB Class;

(2)     Awarding Plaintiffs and the WMI Class and WMB Class compensatory damages believed to exceed $5,000,000;

(3)     Awarding Plaintiffs and the WMI Class and WMB Class statutory and exemplary damages where permitted;

(4)     Permanently enjoining Defendants from continuing to engage in the unlawful and inequitable conduct alleged herein;

(5)     Declaring that Defendants have engaged in the unlawful and inequitable conduct alleged herein;

(6)     Ordering Defendants to make restitution and/or disgorge into a common fund or a constructive trust all monies paid by Plaintiffs and the WMI Class and WMB Class to the full extent to which Defendants were unjustly enriched by their unlawful and inequitable conduct alleged herein;

(7)   Granting Plaintiffs and the WMI Class and WMB Class the costs of prosecuting this action, together with interest and reasonable attorneys' and experts' fees; and

(8)   Granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs and the WMI Class and WMB Class demand a trial by jury on all issues so triable.

Dated:  New York, New York
          November 17, 2010

**WHALEN & TUSA, P.C.**

**  /s/ Joseph S. Tusa**
Joseph S. Tusa (JT 9390)
33 West 19th Street, 4th Floor
New York, NY  10011
Tel. (212) 400-7100
Fax. (212) 658-9685

**LOWEY DANNENBERG COHEN**
**  & HART, P.C.**
Peter D. St. Philip, Jr. (PS 0726)
One North Broadway, 5th Floor
White Plains, NY  10601
Tel.  (914) 997-5000
Fax. (914) 997-0035

***Attorneys for Plaintiffs***
***and Class Counsel***